# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

QIAO HUA LI,

*Petitioner,*

v.

ALBERTO R. GONZALES, Attorney
General,

*Respondent.*

No. 03-2525

On Petition for Review of an Order
of the Board of Immigration Appeals.
(A77-957-264)

Argued: February 2, 2005

Decided: May 2, 2005

Before LUTTIG, WILLIAMS, and GREGORY, Circuit Judges.

---

Petition denied by published opinion. Judge Williams wrote the
majority opinion, in which Judge Luttig joined. Judge Gregory wrote
a dissenting opinion.

---

## COUNSEL

**ARGUED:** Ning Ye, HEMENWAY & ASSOCIATES, Flushing,
New York, for Petitioner. Michelle Elizabeth Gorden, Senior Litiga-
tion Counsel, UNITED STATES DEPARTMENT OF JUSTICE,
Office of Immigration Litigation, Washington, D.C., for Respondent.
**ON BRIEF:** Peter D. Keisler, Assistant Attorney General, M. Jocelyn
Lopez Wright, Assistant Director, UNITED STATES DEPART-

MENT OF JUSTICE, Office of Immigration Litigation, Washington, D.C., for Respondent.

**OPINION**

WILLIAMS, Circuit Judge:

Qiao Hua Li, a citizen of the People's Republic of China, petitions for review of a final order of the Board of Immigration Appeals (BIA) denying her application for asylum and withholding of removal. Li maintains that she is entitled to refugee status because she was persecuted for her resistance to China's coercive population control program. Specifically, Li argues that she was persecuted for having an unauthorized child because she was fined 10,000 Renminbi (RMB) and she was required to have an intrauterine contraceptive device (IUD) implanted against her will. Li also alleges that she has a well-founded fear of being persecuted in the future if she returns to China. The BIA concluded that the fine and the IUD requirement did not rise to the level of persecution and that any fear Li had of future persecution was not well founded. Because the BIA's decision was not manifestly contrary to law or an abuse of discretion, we affirm.

I.

Li was born on March 12, 1980 in Fuzhou, Fujian Province, China. In January 1997, Li married Jing Cai Yang, in a traditional marriage ceremony despite the denial of their application for a marriage certificate because Li was underage.[1] Four months later, Li became pregnant even though she and Yang lacked a marriage certificate. Fearing that the Chinese government would force her to abort the unauthorized pregnancy, Li and her husband fled into the mountains, and her child was born on January 12, 1998. Li and her husband returned home eight months after the child was born. Upon returning, they were fined 10,000 RMB for the unauthorized birth. They did not pay the fine and were "harassed" by family-planning authorities. In her

---

[1]Chinese law prohibits women from marrying until they are twenty years of age.

brief, Li contends that this fine was more money than she and her husband earned in a year.

In addition, after Li returned home, Chinese officials "forced [her] to submit to an IUD insertion against [her] will." (J.A. at 1, 10; Supp. J.A. at 24.) Li initially experienced "abnormal menstruation" from the IUD, but the effects lessened over time and now Li can "tolerate it." (J.A. at 10; Supp. J.A. at 24.) She was checked every few months by Chinese doctors to ensure that the IUD was still in place and that she was not pregnant. Li testified that the family-planning officials came to her home in China to collect the fine every year and that her husband did not live at home in order to avoid being harassed by the officials. Li's son lives with her parents. Li testified that she repeatedly asked to remove the IUD while in China, but the Chinese officials refused those requests. Although Li has been in the United States since 2001, she has not had the IUD removed. She testified that she "dare not have it removed" because she fears the repercussions if she is returned to China and it has been removed. (Supp. J.A. at 66.)

Li incurred a debt to smugglers of more than $60,000 for help to flee China through Hong Kong and Japan. She arrived in the United States, at the Los Angeles International Airport, on July 31, 2001, and was detained by officials because she failed to present proper travel documents. Because Li told the officials that she feared returning to her native China, she was referred to an asylum officer for an interview. *See* 8 U.S.C.A. § 1225(b)(1)(A) (West). Following this interview, the asylum officer determined that Li had a "credible fear of persecution" and that further proceedings were necessary. *See* 8 U.S.C.A. § 1225(b)(1)(B)(ii).

The Government charged Li with removability and began removal procedures against her. Li conceded removability, but requested asylum and withholding of removal. Li's proceedings initially commenced in California, but were transferred to New York, where Li moved upon arrival in the United States. In November, 2001, a status hearing was conducted in New York. During that hearing, Li's immigration case was transferred again, to Virginia, where Li apparently now resides.

On November 20, 2002, the immigration judge (IJ) conducted the merits hearing in Li's case. Li was not accompanied by counsel to the courtroom. When the IJ asked Li where counsel was, Li responded that she was "not expecting him," and that he was not coming "[b]ecause the fee [wa]s too high" and she "couldn't afford it."[2] (Supp. J.A. at 53.) After the IJ conferred with counsel by telephone to confirm that he was no longer representing Li, the hearing continued.

The IJ concluded that Li had not been persecuted and did not have a well-founded fear of persecution because neither the fine nor the IUD insertion were severe enough to amount to persecution.[3] The IJ also noted that Li had not had the IUD removed while she was in the United States, and that her husband and child were still living in China. The IJ ordered that Li be removed to China.[4]

---

[2]All of Li's testimony at the hearing has been translated from the Mandarin and Fu-zhou languages.

[3]The IJ also concluded that Li could not have been fined for having a child out of wedlock based on the timing of Li's marriage. This conclusion was erroneous and was apparently not relied on by the BIA. The IJ, apparently as a result of the language barrier, did not understand that Li's 1997 marriage was not sanctioned by the Chinese government and that therefore any child born of the marriage was not authorized by the one child policy. This error was not fatal, however, because the IJ also analyzed Li's claim in the alternative, assuming that she had in fact been fined for having a child out of wedlock.

[4]At the time that the IJ rendered its decision, Hong Kong was still independent of China, and the IJ ordered Li removed to Hong Kong or, in the alternative, to China. Since that time, Hong Kong has reverted to Chinese control, and the BIA amended the IJ's order to provide for Li's removal to China. In a section of her brief that is largely incomprehensible, Li apparently asks us to order that she be deported to Hong Kong, even though she acknowledges that such an order would be "technically impossible to . . . enforce[ ]." (Appellant's Br. at 27.) Because this section of Li's brief contains no citation to legal authority, Li forfeited the argument. *See* Fed. R. App. P. 28(a)(9)(A) (noting that the appellant's brief must contain, inter alia, "citations to the authorities . . . on which the appellant relies."); *Shopco Distribution Co., Inc. v. Commanding General of Marine Corps*, 885 F.2d 167, 170 n.3 (4th Cir. 1989) (noting that claims are forfeited if brief does not comply with Rule 28). In any event, the BIA's decision to amend the IJ's removal order in light of Hong Kong's reversion to China was not an abuse of discretion.

Li filed a notice of appeal with the BIA. On November 25, 2003, the BIA adopted the IJ's ruling and denied Li's asylum claim. The BIA found that "[Li] ha[d] not been persecuted in the past by being forcibly sterilized or forced to have an abortion. Rather, [Li] was required to use an intrauterine birth control device, which she continues to use in the United States of her own volition, and to pay a fine." (J.A. at 1.) The BIA concluded that Li had failed to "establish that either [the IUD or the fine] constitute[d] harm rising to the level of persecution." (J.A. at 1.) The BIA also noted that "the father of [Li's] child, with whom she entered into a traditional marriage, remains in China unharmed despite the non-payment of the fine." (J.A. at 1.) Thus, concluded the BIA, Li "failed to establish an objectively reasonable fear that, if . . . returned to China, she [would] suffer greater harm, rising to the level of persecution." (J.A. at 1.) Li then filed the instant petition for review, which we have jurisdiction to entertain under 8 U.S.C.A. § 1252(a) (West 1999).

## II.

On petition for review, the BIA's determination that an alien is not eligible for asylum must be upheld unless that determination is "manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D) (West 1999). "[A]dministrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B) (West 1999). Thus, we may reverse the denial of Li's asylum application only if the evidence "was so compelling that no reasonable fact finder could fail to find the requisite fear of persecution." *Rusu v. INS*, 296 F.3d 316, 325 n. 14 (4th Cir. 2002) (internal quotation marks omitted); *see also Blanco de Belbruno v. Ashcroft*, 362 F.3d 272, 284 (4th Cir. 2004).

Under the Immigration and Nationality Act, the Attorney General may confer asylum to anyone who is a "refugee." Prior to 1997, circuit courts and the BIA had uniformly held that victims of China's "one child" policy had not been persecuted on a protected basis, and had denied asylum requests based on this ground. *See, e.g.*, *Chen v. INS*, 95 F.3d 801 (9th Cir. 1996); *Chen Zhou Chai v. Carroll*, 48 F.3d 1331 (4th Cir. 1995). To change this result, Congress, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996

(IIRIRA), created 8 U.S.C.A. § 1101(a)(42)(B). That section provides, in relevant part:

> For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion, and a person who has a well founded fear that he or she will be forced to undergo such a procedure or subject to persecution for such failure, refusal, or resistance shall be deemed to have a well founded fear of persecution on account of political opinion.

8 U.S.C.A. § 1101(a)(42)(B)(West 1999).

In *Chen v. INS*, 195 F.3d 198 (4th Cir. 1999), we interpreted this section as follows:

> In amending the Immigration and Nationality Act, Congress included three additional classes of individuals in the definition of "refugee": 1) persons who had been forced to undergo an involuntary sterilization or abortion; 2) persons who had been persecuted for refusing to undergo such a procedure or for other resistance to a coercive population control program; and 3) persons who have a well-founded fear of being subjected to [a forced abortion or sterilization, or persecuted for resistance to] a coercive population control program. *See* 8 U.S.C.A. § 1101(a)(42). By including applicants with a "well founded fear" of persecution as a distinct category, Congress directed that an individual in fear of a population control program would be able to qualify for refugee status even in the absence of a showing of past persecution.

*Chen*, 195 F.3d at 202.

In order to establish a well-founded fear of persecution, a petitioner must make both a subjective and an objective showing. *INS v.*

*Cardoza-Fonseca*, 480 U.S. 421, 430-31 (1987). The subjective component can be met through the presentation of "candid, credible, and sincere testimony demonstrating a genuine fear of persecution." *Chen*, 195 F.3d at 201 (internal quotation marks omitted). The subjective "fear [must have] some basis in the reality of the circumstances and [be] validated with specific, concrete facts," *Huaman-Cornelio v. BIA*, 979 F.2d 995, 999 (4th Cir. 1992) (internal quotation marks omitted), and it cannot be "mere irrational apprehension," *M.A. v. INS*, 899 F.2d 304, 311 (4th Cir. 1990) (internal quotation marks omitted). "The objective element requires the asylum petitioner to show, with specific, concrete facts, that a reasonable person in like circumstances would fear persecution." *Chen*, 195 F.3d at 202; *see also* 8 C.F.R. § 208.13(b)(2)(i)(B) (2002).

If an alien can establish past persecution based on a protected factor, the alien is presumed to have a well-founded fear of future persecution. *Gonahasa v. INS*, 181 F.3d 538, 541 (4th Cir. 1999). In contrast, if an alien has been mistreated in the past on the basis of a protected factor, but the mistreatment did not rise to the level of persecution, the alien cannot prove a well-founded fear of future persecution merely by relying on the past mistreatment. *Zalega v. INS*, 916 F.2d 1257, 1261 (7th Cir. 1990) Instead, the alien must prove that she has reason to believe she will be treated *worse*, *i.e.*, persecuted, upon return to her native country. *Id.*

"Persecution involves the infliction or threat of death, torture, or injury to one's person or freedom, on account of one of the enumerated grounds in the refugee definition." *Kondakova v. Ashcroft*, 383 F.3d 792, 797 (8th Cir. 2004) *cert. denied* 125 S. Ct. 894 (2005) (internal quotation marks omitted); *accord Gormley v. Ashcroft*, 364 F.3d 1172, 1176 (9th Cir. 2004) ; *Liu v. Ashcroft*, 380 F.3d 307, 312 (7th Cir. 2004); *see also INS v. Stevic*, 467 U.S. 407, 418 (1984). "Although the term 'persecution' includes actions less severe than threats to life or freedom, actions must rise above the level of mere harassment to constitute persecution." *Dandan v. Ashcroft*, 339 F.3d 567, 573 (7th Cir. 2003) (internal quotation marks omitted); *accord Gormley*, 364 F.3d at 1176; *see Dandan* 339 F.3d at 573 (holding that three-day detention which included interrogations, beatings, and deprivation of food and water did not compel a conclusion of past persecution); *Kubon v. INS*, 913 F.2d 386, 388 (7th Cir. 1990) (find-

ing that brief confinement for political opposition to a totalitarian regime did not constitute persecution); *Mendez-Efrain v. INS*, 813 F.2d 279, 283 (9th Cir. 1987) (holding that a four-day detention did not amount to persecution). "Persecution is an extreme concept that does not include every sort of treatment that our society regards as offensive." *Gormley*, 364 F.3d at 1176 (internal quotation marks and alterations omitted). For example, brief detentions and repeated inter-rogations by governmental officials over a substantial period of time do not rise to the level of persecution. *See, e.g.*, *Zalega*, 916 F.2d at 1260 (upholding BIA's determination that alien had not been perse-cuted despite four years of intermittent searches, arrests, and detain-ments). Similarly, economic penalties "rise to the level of persecution" only if such "sanctions are sufficiently harsh to consti-tute a threat to life or freedom." *Ahmed v. Ashcroft*, ___ F.3d ___, 2005 WL 156631, *2 (8th Cir. Jan. 26, 2005); *see also Stevic*, 467 U.S. at 418. ("[Persecution] has also been construed to encompass economic sanctions sufficiently harsh to constitute a threat to life or freedom.").

Courts, thus, have been reluctant to categorize detentions unaccom-panied by severe physical abuse or torture as persecution. *See Dandan* 339 F.3d at 574; *Borca v. INS*, 77 F.3d 210, 213 (7th Cir. 1996) (upholding determination that illegal searches, interrogations and threatening phone calls did not amount to persecution); *Skalak v. INS*, 944 F.2d 364, 365 (7th Cir. 1991) (upholding determination that two three-day detentions and interrogations did not amount to persecu-tion); *Zalega*, 916 F.2d at 1260 (upholding determination that repeated interrogations did not amount to persecution). Even "[m]inor beatings and . . . detentions lasting two or three days, do not amount to . . . persecution." *Kondakova*, 383 F.3d at 797 (internal quotation marks omitted). In contrast, when one who seeks asylum demon-strates that he has been severely physically abused or tortured, courts have not hesitated to characterize such treatment as persecution. *Bace v. Ashcroft*, 352 F.3d 1133, 1138 (7th Cir. 2003) (finding persecution when petitioner was beaten successively by multiple assailants, was attacked and cut with a razor, his home was broken into, his father beaten, and his wife raped in front of him and his family); *Asani v. INS*, 154 F.3d 719, 725 (7th Cir. 1998) (stating that it was "likely that the events described by [the petitioner] — being beaten resulting in the loss of two teeth, deprived of food and water, detained in a cell

with no room to sit, and chained to a radiator—[we]re sufficiently serious to rise beyond the level of mere harassment"); *Vaduva v. INS*, 131 F.3d 689, 690 (7th Cir. 1997) (upholding determination that a petitioner was persecuted when he was severely beaten and suffered a broken finger).

In this case, Li argues that she has suffered past persecution for her resistance to China's coercive population control program and that she has a well-founded fear that the persecution will recur if she returns to China. Specifically, Li contends that both the 10,000 RMB fine and the required insertion of the IUD were persecution for having had an unauthorized child. For the reasons that follow, we hold that the BIA's decision that neither the fine nor the IUD insertion amounted to persecution was not manifestly contrary to law or an abuse of discretion.

We first consider whether the BIA was compelled to conclude that the 10,000 RMB fine amounted to persecution. As we have noted, economic penalties rise to the level of persecution only if they are so harsh as to constitute a threat to life or liberty. According to Li, 10,000 RMB, an amount equivalent to approximately $1,300, is more than one year's wages for her family in China. Although we acknowledge that Li's fine is a harsh one, we do not believe that it is so large as to compel a finding that it threatens Li's life or freedom. The 2000 State Department Report on China, which was adopted by the IJ, notes that "[i]n Quanzhou, Fujian Province, the fine for violating birth quotas is . . . to be paid over a 12 to 13 year period." U.S. Department of State Country Reports on Human Rights Practices for 2000 (China) *available at* http://www.state.gov/g/drl/rls/hrrpt/2000/eap/684.htm (released Feb. 23, 2001). Thus, Li and her husband were given a substantial period of time to repay the fine, mitigating any risk that the magnitude of the fine posed to Li's life or freedom. Our conclusion is buttressed by the fact that Li was willing to incur a debt of more than $60,000 to the smugglers who brought her to this country. Given that Li was willing to undertake such a sizeable obligation *voluntarily*, we cannot reasonably say that the BIA was compelled to conclude that the much smaller fine threatened Li's life or freedom.

We next consider whether the BIA was compelled to conclude that Li was persecuted when she was required to submit to the insertion

of an IUD. Here, because Li has not alleged that she was or will be subject to, or has refused to undergo, a forced abortion or forced sterilization, we must consider only whether she "has been persecuted . . . for other resistance to a coercive population control program" or has a well-founded fear of such persecution. 8 U.S.C. § 1101(a)(42). Moreover, because neither the Board nor the IJ addressed the issue of whether the mistreatment Li alleges was imposed "for other resistance to a coercive population control program," we would be required to remand to the Board for an initial determination on that issue if it were necessary to dispose of this case. *See INS v. Ventura*, 537 U.S. 12, 17 (2002) (per curiam). Therefore, we address only the narrow issue of whether the penalties of which Li complains constituted "persecution" within the meaning of 8 U.S.C. § 1101(a)(42).

Of these penalties, we have already determined that the fine did not rise to the level of economic "persecution." Thus, we have only to consider whether the IUD requirement constituted persecution. Moreover, because Li challenges only the *insertion* of the IUD as mistreatment constituting persecution, our holding is correspondingly narrow. In particular, Li does not argue that the harms and injuries associated with compelled IUD *usage* — such as the continuing invasion of her most intimate bodily privacy and the potentially indefinite disabling of her reproductive capability — when taken together with the flagrant violation of personal privacy involved in the actual insertion of the IUD, might collectively rise to the level of "persecution." Instead, apparently because she has voluntarily chosen to leave the IUD in place during her residence in the United States, (Supp. J.A. 25), Li challenges on appeal, as the treatment constituting persecution, only the *act of inserting* the IUD. (*See* Pet. Br. at 27-35; Supp. J.A. at 32 ("The IUD, as an instrument, in the victim's body, is not itself a persecution[;] the process of forceful insertion of the IUD into the body of an unwilling recipient is a persecution.").)

Therefore, on this issue, the sole question presented to us is whether the *single event* of insertion of the IUD constituted persecution. Moreover, even as to this single act, Li does not allege force, physical abuse, or other equivalent circumstances, and thus she does not challenge the manner or means of the insertion. *Contrast Li v. Ashcroft*, 356 F.3d 1153, 1158 (9th Cir. 2004) (holding that a half-hour compelled gynecological examination, conducted by means of

force and physical restraint while the victim resisted by kicking and screaming, constituted "persecution"). Rather, Li claims only that she was required to submit to what we are left (by the bareness of the record and her arguments) to believe was a medically routine insertion. That is, but for the fact that the procedure was required, the record contains no evidence that the procedure differed from a voluntary IUD insertion, which typically does not cause substantial pain or lasting side effects. *See Novak's Textbook on Gynecology* 225 (Howard Jones III et al., eds., 11th ed. 1998); *Williams Obstetrics* 1363 (Gary F. Cunningham et al., eds., 20th ed. 1997); *Danforth's Obstetrics and Gynecology* 633 (James R. Scott et al., eds., 7th ed. 1994). On these specific and bare allegations, we cannot conclude that the BIA's holding that insertion of the IUD alone did not constitute persecution was "manifestly contrary to law." 8 U.S.C. § 1252(b)(4)(D). If our review here were de novo, or if the record contained evidence of forcible mistreatment or physical abuse of Li during the IUD insertion, or if Li's argument on appeal were not so narrowly limited to the single act of insertion, we might well be prepared to hold that the compulsory insertion and required usage of an IUD constitutes "persecution" within the meaning of 8 U.S.C. § 1101(a)(42). In any event, we would certainly not treat any such claim as dismissively as the IJ and BIA evidently treated Li's claim. But, as we are constrained by the standard of review, the bareness of the record, and the issue as deliberately limited by the petitioner, we cannot conclude that the BIA's determination that Li was not "persecuted" was *manifestly* contrary to law.[5]

---

[5]Our dissenting colleague mischaracterizes our interpretation of "persecution." He argues that we require a finding of "force," construed narrowly to mean "physical restraint," as a necessary predicate to a finding of "persecution." *See post* at 17-18. But there is not even a hint of such in our opinion. On the contrary, our holding explicitly *leaves open* the possibility that the required insertion and continuous usage of an IUD might constitute "persecution," even absent any physical force or restraint whatsoever. Moreover, from our discussion of persecution via *economic* penalties, it is obvious that "persecution" does not always involve physical force or restraint. We have concluded merely that the absence of physical force in the insertion of Li's IUD is *one relevant factor* among several in our determination that the Board did not manifestly err in holding that such an isolated event did not rise to the level of persecution. Judge Gregory's suggestion that we require a showing of physical restraint for any allegation of "persecution" is thus baseless.

Finally, given that we have upheld the BIA's conclusion that Li did not suffer past persecution, we must also uphold the BIA's conclusion that she has not demonstrated a well-founded fear of future persecution. Li presented no evidence suggesting that she will be treated any worse upon her return to China than she has been in the past. *Zalega*, 916 F.2d at 1261. Therefore, the BIA was not compelled to conclude that Li had an objectively reasonable fear of future persecution for resistance to China's coercive population control program.[6]

### III.

For the foregoing reasons, we conclude that the BIA did not abuse its discretion when it determined that Li was not persecuted for resistance to China's coercive population control program. We also conclude that the BIA did not abuse its discretion when it determined that Li had not established a well-founded fear of future persecution. Accordingly, we deny Li's petition for review.

*PETITION DENIED*

GREGORY, Circuit Judge, dissenting:

Even assuming, as the majority finds, that the insertion of Li's IUD was a "medically routine insertion," this insertion was still persecution because Li was compelled coercively to submit to a procedure that caused her harm, that she found offensive, and that was done in violation of her personal bodily privacy. Moreover, Li resisted China's coercive population control program by voicing her opposition to the IUD's insertion and its continued required use. However, I would remand this case to the BIA to consider whether, per 8 U.S.C. § 1101(a)(42)(B), Li's persecution was *on account of* any such resistance. Therefore, I respectfully dissent.

---

[6]Li also argues that she was denied due process by the absence of counsel during her hearing before the IJ. Because Li did not make this argument in her appeal to the BIA, the claim is procedurally defaulted, and we may not consider it. 8 U.S.C.A. § 1252(d)(1)(2) (West 1999).

## I.

Prior to 1997, the BIA consistently held that persecution under China's "one child" family planning policy was not persecution "on account of political opinion," and that victims of these policies were therefore not entitled to asylum. In response to this interpretation, Congress amended the definition of "refugee" to include those who had been persecuted under a coercive family planning program, or who legitimately feared such persecution. *See* 8 U.S.C. § 1101(a)(42) (1999).

Since this amendment some jurisprudence on what qualifies as past persecution or a well-founded fear of future persecution has emerged. Notably, courts have interpreted the plain language of the statute to provide that forced abortions and sterilizations are *per se* persecution and trigger asylum eligibility. *Li v. Ashcroft*, 356 F.3d 1153, 1157 (9th Cir. 2004); *Wang v. Ashcroft*, 341 F.3d 1015, 1020 (9th Cir. 2003). Spouses of those subject to abortions and sterilizations have also been granted asylum. *He v. Ashcroft*, 328 F.3d 593, 603-04 (9th Cir. 2003); *Qi v. Ashcroft*, 329 F.3d 140, 144-45 (2d Cir. 2003); *In re C-Y-Z*, 21 I. & N. Dec. 915, 918 (BIA 1997). A well-founded fear of future persecution has been established in cases in which the Chinese government forbade a woman to have a child based on her parents' violation of the one-child policy, *Zheng v. Ashcroft*, 108 Fed. Appx. 523, 525 (9th Cir. 2004), and in which a woman, who had also experienced past persecution, feared she would have to undergo sterilization and imprisonment for removing an IUD if she returned to China, *Wang v. Ashcroft*, 341 F.3d 1015, 1018 (9th Cir. 2003).

Less defined are cases in which an applicant seeks asylum based on "other resistance to a coercive population program." 8 U.S.C. § 1101(a)(42) (1999). The first and only extensive discussion of this category of asylum-seekers is the Ninth Circuit's decision in *Li v. Ashcroft*, 356 F.3d 1153 (9th Cir. 2004). In *Li*, the court confronted the issue of "whether a young woman who announced her opposition to government population control policies and is thereafter subjected to a forced gynecological exam and threatened with future abortion, sterilization of her boyfriend, and arrest" satisfies this category. 356 F.3d at 1156.

In concluding that she did qualify for asylum, the court analyzed each component of persecution on account of resistance to a coercive population program. Under its discussion of "persecution," the court concluded that Li suffered a forced pregnancy examination (in which she was held down) after she announced her opposition to China's "one-child" policy and that this qualified as past persecution. *Id.* at 1158. It also found that Li had a well-founded fear of future persecution because she was threatened with future abortion and/or sterilization as well as imprisonment. *Id.* at 1159.

The Ninth Circuit then looked at whether a "coercive population control program" existed in Li's city. It found ample evidence that China's program was in effect in Li's city and that it applied to Li because: 1) it set a minimum age for marriage that Li had not met, and 2) limited family size to one child per couple. *Id.* at 1159-60. Next, the court considered Li's "resistance" and found that she resisted in two ways: 1) she vocally resisted the marriage-age restriction when she publicly announced her decision to marry after being denied a marriage license and told an official that she planned to have "many babies," and 2) she physically resisted by struggling during the forced gynecological examination. *Id.* at 1160. Finally, the court considered whether Li's persecution was "on account of" her resistance. In finding that it was, the court explained that "Li clearly would not have been forcibly examined for pregnancy but for her resistance to China's population control program." *Id.*

No court has ruled on whether an involuntary IUD insertion can qualify as persecution on account of other resistance to China's population control program. Indeed, the only circuit courts to consider this issue have remanded the question for further consideration.[1] Thus, our decision in this case is of great import.

---

[1]In an unpublished disposition, the Third Circuit recently remanded a case to the BIA to consider whether a fine plus IUD insertion could qualify as such resistance. *See Fang v. Aschroft*, 114 Fed. Appx. 486 (3rd Cir. 2004) (noting that "the Board and the Circuit Courts have not specifically addressed whether a woman who unwillingly acquiesced to obtaining an IUD 'has been persecuted . . .'" and finding the BIA's use of streamlining case procedures thus improper).

## II.

For Li to be eligible for asylum under 8 U.S.C. § 1101(a)(42)'s "other resistance" provision, she must demonstrate that she was subject to (1) persecution (2) on account of (3) resistance (4) to a coercive population control program.[2]

Looking first to "persecution," the majority seeks to cast the issue of whether an involuntary IUD can qualify as "persecution" under the facts of this case narrowly by asserting that Li only challenges the single event of the *insertion* of the IUD and not its *continued required usage*. *Ante* at 10-11. It then notes that "Li does not allege force, physical abuse, or other equivalent circumstances," but rather that she was only required to have "a medically routine insertion" of an IUD. *Id.* However, neither the record nor common sense supports such a narrow framing of the issue.

First, a full and fair reading of the record and briefs in this case clearly indicates that both the IUD's *insertion* and its *continued required usage* are components of Li's allegations of persecution. Specifically, Li states that she experienced abnormal menstruation

In addition, the Seventh and Ninth Circuits have remanded similar cases. The Ninth Circuit remanded a case in March 2004 that presented the issue of whether a fine and an involuntary IUD can demonstrate that one has a well-founded fear of future persecution. *Chen v. Ashcroft*, 362 F.3d 611, 622-23 (9th Cir. 2004). The Seventh Circuit remanded a case in September 2004 for a determination of whether three involuntary IUD insertions and mandatory pregnancy checkups could constitute persecution as a "coercive population control program" and whether the applicant's efforts to have an IUD removed is the type of "resistance" that Congress sought to protect under the statute. *Lin v. Ashcroft*, 385 F.3d 748, 757 (7th Cir. 2004).

[2]A strict one-child policy is in place in Li's home, Fuzhou City, because it is a large city in China. Supp. J.A. 101; *see China: Profile of Asylum Claims and Country Conditions* (U.S. State Department, April 14, 1998) (stating that Fujian Province, in which Fuzhou City lies, has a one-child policy). Because this does not appear to be in dispute, I do not analyze this element separately.

after the IUD was inserted, that it has caused her pain, and that she has been subject to quarterly gynecological exams to make sure that the IUD was still inserted. J.A. 6, 29-30, 46-47; Petitioner's Br. at 1. Such statements clearly indicate that Li is challenging the continued required usage of the IUD as well as its insertion.

Second, common sense dictates that the majority's attempt to separate the insertion of the IUD from its continued required usage is indeed flawed. Despite the majority's best efforts, one cannot separate the insertion of a device into the body — a device that only works if it remains inserted — from the continued usage of such a device. Rather the insertion and continued required usage of an IUD are part and parcel of the claim of persecution.[3] To separate these realities in such an artificial manner is to evade the very real and difficult issue in this case — whether both the insertion of an IUD and its continued required usage fall under the definition of "persecution."

Turning now to a *full* analysis of this issue, case law has characterized "persecution" as "an extreme concept" marked by "'the infliction of suffering or harm . . . in a way regarded as offensive.'" *Fisher v. INS*, 79 F.3d 955, 96 (9th Cir. 1996) (en banc) (quoting *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir. 1995)); *see also Fatin v. INS*, 12 F.3d 1233, 1240 & n.10 (3d Cir. 1993) (stating that persecution denotes "extreme conduct"). Here, Li testified that she was required to submit to an IUD that she did not want, that she found it uncomfortable, that it caused abnormal menstruations, and that she asked for it to be removed on several occasions, testimony that the IJ did not discredit.[4]

---

[3]Indeed, it should go without saying that if the Chinese government was persecuting Li by requiring her to submit to an IUD, that then removing the IUD (as the majority is fictionally doing by failing to consider its continued required usage) would undermine the goal of that persecution.

[4]The IJ only noted that Li's failure to have it removed once present in the United States, given that her husband was in China, was suspect. The implication of the IJ's statement is itself suspect. Li testified that she did not dare to have the IUD removed for fear of what would happen if she returned to China without it. That her husband is still in China but she still had the IUD, which acts as a birth control device, is simply irrelevant.

Looking to the definition of persecution, Li was compelled to submit to a procedure that caused her suffering and that she found offensive — a procedure in which a foreign object was inserted into her body. In addition, Li was required to keep the IUD inserted despite both her physical pain over its usage and her objection to its usage as a birth control device. The insertion and continued required usage of the IUD constitute both a violation of Li's personal bodily privacy *and* a continuing invasion of that privacy. I would thus find that these acts clearly meet the definition of "persecution."

Under the majority's narrow consideration of the issue of "persecution," it places much weight on the fact that Li presented no evidence that she was forcibly inserted with the IUD, suggesting in turn, that submitting to an IUD insertion, even if one does not desire it, does not equate to persecution. This argument assumes that Li has to demonstrate that she was physically restrained for the insertion to qualify as persecution. However, persecution under 8 U.S.C. § 1101(a)(42)(B) is not limited to situations involving physical restraint or force. *See Ding v. Ashcroft*, 387 F.3d 1131, 1139 (9th Cir. 2004) (finding that reading into the statute a "physical restraint" requirement would contravene the statute's purpose to bestow refugee status onto those individuals persecuted under China's "coercive" population control program). The majority's insinuation of a physical restraint requirement onto the statute, which it buttresses by extensively reviewing cases in which courts have found persecution (under the more general persecution statute) in the face of severe physical abuse, is simply at odds with the plain language of the statute in this case (which specifically addresses *coercive* population control programs) and is thus irrelevant to our analysis here.[5] Yet the absence of physi-

---

[5]Even if the definition of persecution does involve some degree of "force," as the majority assumes, the ordinary meaning of "force" includes "to constrain or compel by physical, moral, or intellectual means or by exigencies of circumstances," *Webster's International Dictionary* 887 (3d ed. 1981), and "to compel, constrain, or oblige (oneself or someone) to do something," *Webster's College Dictionary* 512 (2d ed. 2000). Thus, the common meaning of "force" can apply to situations in which one is "compelled" to do something by means other than physical restraint and can certainly encompass what the majority refers to as a "medically routine insertion." Indeed if one did try to struggle during the procedure, the result would likely be only more discomfort and possible harm to the uterus.

cal force is the *only* ground on which the majority bases its finding that the insertion of the IUD is not "persecution" under this statute.[6]

Although I would find that Li was subject to persecution, under the statute she still must demonstrate that she resisted China's coercive population control program and that her persecution was on account of such resistance. Yet the IJ, whose review of Li's claim can only be characterized as cursory and dismissive, as well as the BIA, who entered merely a perfunctory order adopting the IJ's disposition, did not reach these latter two issues. I thus review them briefly.

In considering Li's resistance, I look to the ordinary meaning of the word "resistance." It is defined as "the act or power of resisting, opposing, or withstanding." *Webster's College Dictionary* 1124 (2d ed. 2000). "Resisting" in turn is defined as "to withstand, strive against, or oppose . . . ." *Id.*

In this case, Li testified that she did not want the IUD and that she further asked that it be removed several times but that her requests were denied. While Li's voiced opposition to the IUD was not made in a public manner, as in the Ninth Circuit's *Li* case, I do not read the statute to require public resistance. Expressing one's opposition to the implementation of the coercive population control program, as Li did when she opposed the IUD's insertion and repeatedly asked the IUD to be removed, is no less "resistance" than would be a public representation of her opposition. I would thus find that the record fully supports a conclusion that Li "resisted" China's coercive population control program.

Under the statute, a causal connection must also exist — Li's persecution must be "on account of" her resistance. Here, neither the IJ

---

[6]The majority's assertion that it has "concluded merely that the absence of physical force in the insertion of Li's IUD is one relevant factor among several in [its] determination," *ante* at 11 n.5, is hard to fathom given that it distinguishes this case on the ground that it does not involve forcible mistreatment or physical abuse and then intimates that it "might be well prepared to hold that the compulsory insertion and required usage constitutes persecution," if such forcible mistreatment or physical abuse were present, *id.* at 11.

nor the BIA considered whether any such causal connection exists and the record is not otherwise clear on this issue. It could be that the IUD's insertion was simply a routine facet of China's administration of its policy, in which case the "on account of" element would not be satisfied. *See* Supp. J.A. 101 (noting that "women who do not qualify for a Family Planning Certificate that allows them to have a child must use an intrauterine device (IUD) or implant"). Or, Li may be able to demonstrate that at least part of the family planning officials' motivation in subjecting her to the insertion of an IUD (or its continued required usage) was her opposition to China's policy.[7] *See Lukwago v. Ashcroft,* 329 F.3d 157, 170 (3d Cir. 2003) ("A persecutor may have multiple motivations for his or her conduct, but the persecutor must be motivated, at least in part, by one of the enumerated grounds.") (citing *Chang v. INS,* 119 F.3d 1055, 1065 (3d Cir. 1997)). I would thus remand the case for consideration of this issue.

## III.

I dissent from the majority's conclusion that the insertion of the IUD was not persecution as well as its assertion that Li does not challenge the continued required use of the IUD. Li was compelled coercively to submit to a procedure that caused her harm and that she found offensive, a procedure in which a foreign object was inserted (and required to remain inserted) into her body in violation of her personal bodily privacy. This was persecution. Furthermore, Li resisted China's coercive population control program by voicing her opposition to the IUD's insertion and its continued required use. I would, however, remand the case to the BIA to consider the further question of whether Li's persecution was on account of her resistance.

---

[7]For example, if Li presented evidence that she was subjected to an IUD when others, who were similarly situated to herself but who had not voiced opposition, were not, or that family planning officials gave some indication that she was being subjected to an IUD because of her opposition, I believe that Li would be entitled to relief under the statute.