**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-1404

MOCKTAR A. TAIROU,

    Petitioner,

  v.

MATTHEW G. WHITAKER, Acting Attorney General,

    Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: September 27, 2018        Decided: November 30, 2018

Before GREGORY, Chief Judge, MOTZ, Circuit Judge, and William L. OSTEEN, Jr., United States District Judge for the Middle District of North Carolina, sitting by designation.

Petition for review granted and remanded by published opinion. Chief Judge Gregory wrote the opinion, in which Judge Motz and Judge Osteen joined.

**ARGUED:** John Franklin Hester, Jr., MCCOPPIN & ASSOCIATES, PA, Cary, North Carolina, for Petitioner. Jane Tracey Schaffner, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Richard Andrew McCoppin, MCCOPPIN & ASSOCIATES, P.A., Cary, North Carolina, for Petitioner. Chad A. Readler, Acting Assistant Attorney General, Douglas E. Ginsburg, Assistant Director, Katherine A. Smith, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

GREGORY, Chief Judge:

Mocktar Tairou ("Tairou") petitions this Court to review a final removal order by the Board of Immigration Appeals ("BIA") denying his asylum and withholding of removal application and ordering his removal to Benin. Tairou contends that the BIA erred in finding that he was not subjected to past persecution and that he lacked a well-founded fear of persecution were he to return to Benin. Our binding precedent explicitly holds that a threat of death constitutes persecution. Because Tairou experienced multiple death threats in Benin, we hold Tairou established that he was subjected to past persecution. We therefore grant the petition for review and remand to allow the BIA to consider whether, in light of Tairou's demonstrated past persecution, he has a well-founded fear of future persecution.

I.

A.

Tairou was born in Benin in 1977. Although Tairou is married to a woman, he testified that in 2007, he developed affectionate feelings for a man and "figured out [he] was a homosexual." J.A. 73. In 2008, Tairou met a French man named AY through a website.[*] The two men eventually developed a romantic relationship. In 2009 and again in 2013, AY came to visit Tairou in Cotonou, Benin, where Tairou rented an apartment for AY. Tairou informed his wife and his father about his relationship with AY, and they

_____

[*] In the interest of protecting Tairou's partner's privacy, we refer to him only by letters.

2

both accepted it. After learning of the relationship, Tairou's wife informed him that she in fact viewed herself as a lesbian. Although Tairou was open with his wife and father about his romantic relationship with AY, Tairou and AY generally kept their relationship a secret.

Despite the general secrecy surrounding their relationship, Tairou and AY were openly affectionate with each other in front of Tairou's cousin, Djamiou, during a night out in Cotonou in August of 2013. Because Tairou was very close with his cousin, he did not think that Djamiou would have a problem with his relationship. During the evening, Djamiou took pictures of AY and Tairou hugging and kissing in a restaurant booth.

Shortly after the evening out, Tairou's uncle called to tell Tairou that he needed to come to his father's home village due to a family emergency. When he arrived, Tairou was directed to the backyard of his father's house where he encountered a group of approximately 40 men, including his two uncles, Aminou and Djibril, cousins of Tairou's father, ministers from the mosque, and other villagers unrelated to Tairou. Tairou's uncle, Aminou, asked him how things were going with AY and showed Tairou the pictures Djamiou had taken of Tairou and AY kissing and hugging.

The crowd kept Tairou in the backyard, threatening and harassing him for five hours. During that time, members of the group threatened to cut off his penis if they saw Tairou and AY together again. "One after the other," the people in the backyard took turns pulling Tairou's ears and slapping him in the face. J.A. 86. They "forbid [him] from keeping on with this relationship" and told him that he was "bringing a bad name on their family." J.A. 86. In Tairou's declaration attached to his application for asylum, he

3

asserted that several of the people at the village gathering said that he "should die," and "some of them outright threatened to kill [him]." J.A. 210. In addition to threatening and taunting Tairou about his relationship with AY, the men in the backyard offered Tairou a beer, consumption of which is forbidden in Islam. Djamiou had reported to his uncle that Tairou was consuming alcohol. Tairou declined the beer and begged the group to let him go. Tairou promised that he would not continue the relationship with AY, saying "everything [he] could say so they would just let me go." J.A. 87. Finally, after five hours, the crowd allowed Tairou to leave.

Approximately one week later, Tairou's cousins Djamiou and Sefou knocked on Tairou's door in Cotonou. When Tairou opened the door, Djamiou and Sefou pushed him inside and closed the door. Djamiou told Tairou that "despite everything we told you at the village, you are keeping on going with [AY]." J.A. 91. Tairou's cousins then began to beat him with curtain holders that were on the floor. *Id.* In his declaration, Tairou asserted that Djamiou and Sefou threatened to "kill [him], to shame [him] publicly again," and to harm his wife and children. J.A. 210. On their way out of Tairou's home, Djamiou showed Tairou a knife at his belt and told Tairou that if he did not stop his relationship with AY, "this is what's going to happen." J.A. 95.

During the attack, Tairou's youngest son, Lufti, sustained head and arm injuries trying to protect his father. Tairou took Lufti to the hospital where Lufti stayed overnight to receive medical treatment. Tairou sustained a wound to his arm during the attack but did not seek medical treatment. Tairou testified that he could not report the threats from

4

his relatives to the police and that he felt the Beninese police would be unwilling to protect him.

After the home invasion, Tairou and his family heard knocking at the door approximately every two days, but no one was there when they opened the door. Tairou and his family also received several threatening phone calls from an unknown number warning him: "Watch out. Be careful. You keep going with this watch out, we will come back." J.A. 96. The calls continued even though Tairou's family changed their number twice. Due to the knocking and threatening phone calls, Tairou and his family "decided to leave and to try to find a more secure place to stay." J.A. 96. Tairou's wife and children are still in hiding at this location in Cotonou.

In the wake of the incident in the village and home invasion, AY told Tairou that two policemen came to his apartment to inform AY that he had been "turned in as a homosexual." J.A. 99. As a result, AY left Benin. Tairou is no longer in contact with AY. When he left Benin, AY told Tairou "that he wanted to forget about Benin completely." J.A. 99.

If Tairou goes back to Benin, he fears his relatives will find him and "keep on hurting [him]," because they know he is bisexual and has bisexual and homosexual friends. J.A. 99. Tairou further testified that because of what AY told him about the police officers who arrived at his place, he will not be able to depend on any police protection should anything happen.

5

Tairou applied for admission to the United States at the Washington, D.C. port of entry on March 9, 2014. On March 18, 2014, an asylum officer found that Tairou demonstrated a credible fear of persecution or torture as a member of a sexual minority in Benin and referred Tairou to an immigration judge ("IJ"). The Department of Homeland Security initiated removal proceedings, charging that Tairou was inadmissible to the United States due to his lack of a valid entry document pursuant to 8 U.S.C. § 1182(a)(7)(A)(i)(I). Before the IJ, Tairou conceded removability and applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").

At the hearing, Tairou described his experience at his father's village, as well as the attack by his cousins and the anonymous phone calls and knocks that followed. Tairou submitted documentation regarding his sexuality and color photographs of the injuries he sustained during the attack at his home. Tairou also submitted evidence of country conditions in Benin that indicated that "homosexuality is very unacceptable" and "violent reprisal is a real danger." J.A. 357. A Canadian governmental travel advisory for Benin stated that although homosexuality was not illegal, it could lead to arrest under laws such as indecent exposure. J.A. 348. However, a United States State Department Benin Country Report indicated that homosexual behavior was discouraged but "neither prosecuted nor persecuted." J.A. 327.

The IJ determined that Tairou's testimony was credible and that he had established membership in a particular social group defined as "homosexuals in Benin." J.A. 44. The

IJ nevertheless denied Tairou's petition for asylum, withholding of removal, and CAT protection. Specifically, the IJ found that Tairou had not established that he had suffered past persecution or that he had a well-founded fear of persecution if he returned to Benin. Tairou appealed the IJ's decision to the BIA. The BIA issued its own opinion, finding *de novo* that Tairou had failed to establish that he suffered past persecution and that he had a well-founded fear of future persecution. Accordingly, the BIA concluded that Tairou did not qualify for asylum, withholding of removal, or protection under the CAT. Tairou timely appeals the BIA's decision as to his application for asylum and withholding of removal.

## II.

The BIA's determination regarding eligibility for asylum or withholding of removal is affirmed if supported by substantial evidence on the record considered as a whole. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). In reviewing the BIA's decision, the Court is "obliged to uphold the BIA's determinations unless they are manifestly contrary to the law and an abuse of discretion." *Djadjou v. Holder*, 662 F.3d 265, 273 (4th Cir. 2011) (internal citation and quotation marks omitted). The BIA abuses its discretion "if it fail[s] to offer a reasoned explanation for its decision or if it distort[s] or disregard[s] important aspects of the applicant's claim." *Id.* (alterations in original) (internal citation and quotation marks omitted). The BIA also abuses its discretion in making an error of law. *Menghesha v. Gonzales*, 450 F.3d 142, 147 (4th Cir. 2006).

7

Where, as here, the BIA did not adopt the IJ's opinion but instead offered its own reasons for denying relief, the Court reviews the BIA's order rather than the IJ's ruling. *Ngarurih v. Ashcroft*, 371 F.3d 182, 188 (4th Cir. 2004). The BIA's factual findings are "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Menghesha*, 450 F.3d at 146 (quoting 8 U.S.C. § 1252(b)(4)(B)). The BIA's legal conclusions are reviewed *de novo* with "appropriate deference" to its interpretations of the Immigration and Nationality Act. *Id.* (citing *Nwolise v. INS*, 4 F.3d 306, 309 (4th Cir. 1993); *see also Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984)).

III.

On appeal, Tairou contends that the BIA erred by failing to appropriately consider the cumulative effects of the harm inflicted on him and his family members. He argues that targeted death threats and threatening phone calls may establish a finding of past persecution. Had the BIA properly considered the cumulative effects of the harm inflicted on him and his family members, including the death threats he received at the public gathering at the village and the violent home invasion, Tairou argues that the BIA would have found him to be a victim of past persecution and he would have been entitled to a rebuttable presumption of a well-founded fear of future persecution. The Government does not dispute the credibility of Tairou's testimony, and it concedes — as it must — that he has stated a valid particular social group. *See, e.g.*, *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1073 (9th Cir. 2017); *Nabulwala v. Gonzales*, 481 F.3d 1115,

8

1117 (8th Cir. 2007).  The Government argues that the BIA's decision should be upheld, however, because the harm suffered cumulatively by Tairou does not constitute past persecution.  We agree with Tairou and remand the petition for further consideration by the BIA.

## A.

The Immigration and Nationality Act ("INA") authorizes the Attorney General to confer asylum on any refugee.  8 U.S.C. § 1158 (b)(1)(A).  An applicant bears the burden of proving eligibility for asylum.  *Naizgi v. Gonzales*, 455 F.3d 484, 486 (4th Cir. 2006); 8 C.F.R. § 1208.13(a), (b)(1).  Eligibility for asylum under the INA may be established in two ways.  8 U.S.C. § 1101(a)(42)(A).  First, the petitioner may show that he was subjected to past persecution, in which case he is entitled to a rebuttable presumption that he has a well-founded fear of future persecution.  *Id.*; *Ngarurih*, 371 F.3d at 187.  Second, the applicant may show that he has a well-founded fear of future persecution. 8 U.S.C. § 1101(a)(42)(A).  In either case, the past persecution or well-founded fear of persecution must be "on account of race, religion, nationality, membership in a particular social group, or political opinion."  *Id.*  "Persecution involves the infliction or threat of death, torture, or injury to one's person or freedom, on account of one of the enumerated grounds in the refugee definition."  *Li v. Gonzales*, 405 F.3d 171, 177 (4th Cir. 2005) (internal citations omitted).  Persecution may include actions less severe than threats to life or freedom, but "actions must rise above the level of mere harassment to constitute persecution."  *Id.* (internal citations omitted).

9

The BIA erred by finding that Tairou had not established past persecution, despite Tairou's credible testimony of death threats he received in Benin. In concluding *de novo* that Tairou did not suffer persecution in Benin, the BIA reasoned that Tairou suffered no major physical injuries and that he did not claim to have suffered long-term mental harm or problems. The BIA thus concluded that the harm suffered cumulatively by Tairou did not rise to the level of persecution. However, the record indicates that Tairou received multiple death threats that the BIA failed to address. Indeed, the Government conceded at oral argument that Tairou suffered at least "an implicit death threat" when his cousin brandished a knife after the home invasion. Because Tairou received multiple, explicit threats of death both during and after the village gathering, the BIA's conclusion as to past harm contravenes our express and repeated holding that the "threat of death" qualifies as persecution. *See Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015) ("[W]e have expressly held that the threat of death qualifies as persecution.") (internal quotation marks and citation omitted); *see also Crespin-Valladares v. Holder*, 632 F.3d 117, 126 (4th Cir. 2011) (citing *Li*, 405 F.3d at 177). Contrary to the BIA's reasoning, the threat of death alone constitutes persecution, and Tairou was not required to additionally prove long-term physical or mental harm to establish past persecution.

Because Tairou received multiple threats of death, the BIA's determination that Tairou had not suffered persecution was "manifestly contrary to the law" of this Court and constituted an abuse of discretion. *Djadjou*, 662 F.3d at 273 (internal citation omitted); *Crespin-Valladares*, 632 F.3d at 124 (internal citation omitted). We therefore

10

reverse the BIA's holding that Tairou failed to establish that he was subject to past persecution.

B.

Because we hold that Tairou proved that he was subjected to past persecution in Benin, he is entitled to the presumption of a well-founded fear of future persecution. *Li*, 405 F.3d at 176; 8 C.F.R. § 208.13(b)(1). We do not decide whether the Government can rebut this presumption. Instead, we remand to the BIA to reconsider the question under the proper presumption. *See INS v. Ventura*, 537 U.S. 12, 16-17 (2002) (per curiam); *Oliva v. Lynch*, 807 F.3d 53, 61-62 (4th Cir. 2015).

IV.

For the foregoing reasons, we grant Tairou's petition for review and remand to the BIA to determine whether the Government can rebut the presumption that Tairou has a well-founded fear of future persecution.

*PETITION FOR REVIEW GRANTED AND REMANDED*