**Michael Andrew GORMLEY; Edith Carol Gormley, Petitioners,**

v.

**John ASHCROFT, Attorney General, Respondent.**

No. 02–74091.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 1, 2004.

Filed April 22, 2004.

Carol L. Edward and Eric P. Lin, Seattle, WA, for the petitioners.

Blair T. O'Connor, United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington, DC, for the respondent.

Before: CANBY, WARDLAW, and GOULD, Circuit Judges.

WARDLAW, Circuit Judge:

Michael and Edith Gormley, natives and citizens of South Africa, petition for review of the Board of Immigration Appeals' ("BIA") final order affirming without opinion the Immigration Judge's ("IJ") denial of their applications for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). The Gormleys do not contest the BIA's CAT ruling, but argue that the implementation of South Africa's Employment Equity Act 55 of 1998 ("the Act"), designed to ameliorate past discrimination against the country's black population, has resulted in their economic persecution on account of their race by causing them to lose their longtime jobs and rendering them unable to secure new ones. Mr. Gormley additionally claims that he experienced criminal persecution on account of his race when he was twice robbed by black men, and both he and his wife contend that they

fear further criminal attacks if forced to return to South Africa. Because substantial evidence supports the BIA's decision, we deny the Gormleys' petition.

## BACKGROUND

Michael and Edith Gormley entered the United States as non-immigrant "B-2" visitors for pleasure on June 4, 1999, and received authorization to remain in the country until November 3, 1999. On August 6, 1999, Mr. Gormley filed an Application for Asylum and Withholding of Removal with the former Immigration and Naturalization Service ("INS"), and included his wife on the application. In an affidavit attached to the asylum application, Mr. Gormley claimed a fear of persecution "because of an actual and imputed political opinion ... because [he and his wife] are white." Specifically, Mr. Gormley stated that the new South African government "adopted a constitution which gives job preferences to blacks and, therefore, discriminates against whites solely because of their race." He further claimed that, due to the South African government's "aggressive implementation" of the "new constitutional affirmative action requirements," he is unable to "obtain, and hold, proper employment such that[he] could support [his] family because [he is white]."

In addition to advancing this claim of economic persecution, Mr. Gormley noted that since the fall of apartheid "crime in South Africa has escalated at an alarming rate," and stated that "[i]t is because of this violent, rampant crime that [he] believe[s] that [he] would be in danger of being persecuted if [he] were returned to South Africa." Mr. Gormley recounted two crimes from which he suffered, purportedly due to the fact that he is white. The first occurred in December 1998, and involved the theft of his cell phone by three black men. The second crime took place six months later and was perpetrated by "six black teenage youths armed with

steak knifes" who stole his cell phone and his watch. Mr. Gormley also stated that in June 1999, he was nearly the victim of a third crime at the hands of two black men, but "they were deterred by an approaching car guard" (an unemployed person who watches others' cars for tips).

On January 3, 2000, the INS commenced removal proceedings against the Gormleys by filing Notices to Appear in immigration court. The INS alleged that the Gormleys were subject to removal under 8 U.S.C. § 1227(a)(1)(B), as aliens who had remained in the United States beyond the time permitted. At their removal hearings, the Gormleys admitted the factual allegations against them, conceded removability, and renewed their applications for asylum, withholding of removal, and protection under CAT.

On May 4, 2000, the Gormleys testified before the IJ regarding their alleged persecution in South Africa. Mr. Gormley stated that after graduating from high school he worked as a scaffolding contract supervisor for 27 years. In October 1998, he "was laid-off because [his] company had adopted a[n] affirmative action production policy[pursuant to the Act] and [he] was told that [he] needed to leave to make way for a black man." Mr. Gormley's employer provided him with severance pay equal to nine months' salary, as well as his lifetime pension fund contributions. He also received government-disbursed unemployment compensation for nine months.

Like Mr. Gormley, Mrs. Gormley stated that she had been laid-off from her longtime job due to the race-based discrimination wrought by the Act. Before losing her job in March 1995, Mrs. Gormley had worked at Parcel Express, a government department, for 14 years. Mrs. Gormley stated that she had been laid-off "because we had to make way ... for black people because of affirmative action." She also

received unemployment benefits from the government, but for only six months.

After being laid-off, Mrs. Gormley sought other employment, including as a street hot-dog vendor, but was told that "there was no work available for the white." Mr. Gormley looked for work as a moving person, a dishwasher, a janitor, and a car guard. He also attempted to start his own business. Mr. Gormley testified that in each instance he was unable to gain employment, or small business funding, because he is white. He opined that if he was forced to return to South Africa, he would not be able to secure himself a home due to his inability to find work.

Mr. Gormley further testified that his brother, James, had been laid-off from his job despite 25 years of employment and had not been able to obtain another one. Although Mr. Gormley's two sons were employed in South Africa at the time of the removal hearing, he indicated that both had been told they might be required to forfeit their positions due to the Act. Also, Mr. Gormley stated that "[a] lot of[his white friends in South Africa] ha[d] lost their jobs," and that "[m]ost of them have not been able to secure new jobs." "Some" of Mr. Gormley's black friends had also lost their jobs, "but many are still employed."

In addition to testifying about his purported economic persecution, Mr. Gormley recounted the two criminal attacks to which he was subjected, as well as the botched third attempt to which he nearly fell victim. He stated his opinion that he was singled out for these crimes because he is "a white person and a soft target." By "soft target," Mr. Gormley indicated that he meant a target who had "lived a pretty sheltered life [under apartheid] and [who had become] soft as a result of this." Mrs. Gormley testified that, although she has never been the victim of a crime, she believed that she would be if forced to return to South Africa.

After hearing from the Gormleys, the IJ entered an oral decision denying their petition for asylum, withholding of removal, and protection under CAT. The IJ accepted the Gormleys' factual statements, but rejected their opinion testimony regarding the race-based motives for Mr. Gormley's criminal attacks and their belief that, if returned to South Africa, they would be unable to obtain employment and be subjected to further criminal attacks. The IJ found that the Gormleys failed to establish an objective basis for their claim. First, the IJ determined that nothing in the administrative record indicated that the assailants in Mr. Gormley's criminal attacks "were motivated by anything other than the opportunity to enrich themselves[;] . . . the fact that Mr. Gormley [is] a white man was not the factor which led to their actions." Second, the IJ found that the Gormleys had not suffered economic persecution on the basis of their race. In making its ruling, the IJ noted that the Gormleys had received both severance pay and unemployment benefits, and cited as evidence contravening their economic persecution claim the State Department's assessment that the post-apartheid distribution of wealth "remains highly skewed among racial lines," Bureau of Democracy, Human Rights, and Labor, United States Dep't of State, *1999 Country Report on Human Rights Practices—South Africa*, 1 (Feb. 25, 2000) ("*1999 South Africa Country Report*"). In addition to this report, the IJ admitted into evidence a letter from Kwa–Zulu Natal state legislator Constance Galea, which stated that "the new [South African] government has had to install work and labor legislation to rectify the imbalances of the past and to create a program of upliftment for the previously disadvantaged sections of the South African community, i.e., the black community."

Galea further indicated that, due to a poor economy and an unemployment rate of 38 to 40 percent, there have been many layoffs and finding a replacement job is "extremely difficult." The BIA affirmed the IJ's decision without opinion.

### JURISDICTION

Because the Gormleys' removal proceedings began after April 1, 1997, their petition is governed by the permanent rules of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), as amended, Pub.L. No. 104–302, 110 Stat. 3656 (Oct. 11, 1996). *See Kalaw v. INS,* 133 F.3d 1147, 1149–50 (9th Cir.1997). We, therefore, have jurisdiction over the Gormleys' final removal order pursuant to 8 U.S.C. § 1252(a)(1).

### STANDARD OF REVIEW

■ Where, as here, the BIA affirms the IJ's decision without issuing an opinion, the IJ's decision becomes the BIA's decision. *See Thomas v. Ashcroft,* 359 F.3d 1169, 1174 (9th Cir.2004); 8 C.F.R. § 1003.1(a)(7). Because the IJ found the Gormleys' factual testimony to be credible and the BIA made no contrary finding, we accept that testimony as undisputed. *Baballah v. Ashcroft,* 335 F.3d 981, 987 (9th Cir.2003).

■ We review for substantial evidence the BIA's decision that the Gormleys have not established eligibility for asylum. *Cardenas v. INS,* 294 F.3d 1062, 1065 (9th Cir.2002) (citing *Ochave v. INS,* 254 F.3d 859, 861–62 (9th Cir.2001)). We must uphold the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (quoting 8 U.S.C. § 1105a(a)(4)). The BIA's decision can be overturned "only where the evidence is such that a reasonable factfinder would be compelled

to conclude that the requisite fear of persecution existed." *Ghaly v. INS,* 58 F.3d 1425, 1429 (9th Cir.1995). This standard applies to past persecution as well. *See Chand v. INS,* 222 F.3d 1066, 1076 (9th Cir.2000); *Korablina v. INS,* 158 F.3d 1038, 1045 (9th Cir.1998). "When considering an asylum claim, we consider cumulatively the harm an applicant has suffered." *Chand,* 222 F.3d at 1074.

### DISCUSSION

■ Section 208(a) of the Immigration and Nationality Act ("INA") affords the Attorney General discretion to grant political asylum to any alien deemed to be a "refugee" within the meaning of § 101(a)(42)(A) of the INA, 8 U.S.C. § 1101(a)(42)(A). *See* 8 U.S.C. § 1158(b)(1). "A refugee is defined as an alien unwilling to return to his or her country of origin 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Fisher v. INS,* 79 F.3d 955, 960 (9th Cir.1996) (*en banc*) (quoting 8 U.S.C. § 1101(a)(42)(A)). Thus, an applicant seeking asylum must establish "either past persecution or a well-founded fear of present persecution on account of [a protected ground]." *Mejia–Paiz v. INS,* 111 F.3d 720, 723 (9th Cir.1997) (quotation omitted).

■■ We have previously defined persecution as "'the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive.'" *Ghaly,* 58 F.3d at 1431 (quoting *Prasad v. INS,* 47 F.3d 336, 339 (9th Cir.1995)). Persecution is "an extreme concept that does not include every sort of treatment [that] our society regards as offensive." *Id.* (quotation omitted). "The key question is whether, looking at the cumulative effect

of all the incidents [that a] Petitioner has suffered, the treatment [ ]he received rises to the level of persecution." *Singh v. INS*, 134 F.3d 962, 967 (9th Cir.1998). Punishment "is neither a mandatory nor a sufficient aspect of persecution." *Pitcherskaia v. INS*, 118 F.3d 641, 647 (9th Cir.1997).

## I. Past Persecution

■ To establish past persecution, the Gormleys must demonstrate that: (1) their experiences rise to the level of persecution; (2) the persecution was on account of one or more of the five protected grounds; and (3) the persecution was committed either by the government or by forces that the government was unable or unwilling to control. *Chand*, 222 F.3d at 1073. A showing of past persecution is not required to qualify for asylum. *Mejia–Paiz*, 111 F.3d at 723 (stating that an applicant may qualify for asylum based on "either past persecution or a well-founded fear of present persecution"). However, "[a]n alien who establishes past persecution is entitled to a regulatory presumption that [ ]he has a well-founded fear of future persecution." *Korablina*, 158 F.3d at 1043.

## A. Criminal Persecution

■■ The BIA found that the Gormleys failed to establish past criminal persecution, and the evidence does not compel a contrary conclusion. First, the two attacks that Mr. Gormley suffered do not rise to the level of persecution; robberies of this sort are an all too common byproduct of civil unrest and economic turmoil. *See Huaman–Cornelio v. BIA*, 979 F.2d 995, 1000 (4th Cir.1992) (stating that violence is often the byproduct of civil unrest but is not necessarily specific persecution). Second, Mr. Gormley presented no evidence that the perpetrators victimized him on account of his race as opposed to their observation that he carried a cell phone and a watch. *See Ochave*, 254 F.3d at 865

("Asylum generally is not available to victims of civil strife, unless they are singled out on account of a protected ground."). Third, Mr. Gormley failed to demonstrate that the crimes were committed "by groups that the government is unwilling or unable to control...." *Singh v. INS*, 94 F.3d 1353, 1359 (9th Cir.1996). Random, isolated criminal acts perpetrated by anonymous thieves do not establish persecution. *See Rostomian v. INS*, 210 F.3d 1088, 1089 (9th Cir.2000). In short, the evidence does not compel a finding of criminal persecution.

## B. Economic Persecution

■ Nor does the evidence compel a finding of economic persecution. "We have recognized that purely economic harm can rise to the level of persecution where there is 'a probability of deliberate imposition of substantial economic disadvantage' upon the applicant on account of a protected ground." *Chand*, 222 F.3d at 1074 (quoting *Kovac v. INS*, 407 F.2d 102, 107 (9th Cir.1969)). In *Kovac*, we determined that when Congress deleted the word "physical" from the description of persecution in section 243(h) of the INA, it implicitly provided that economic persecution alone could sustain an asylum claim. 407 F.2d at 106–07 (citing the October 3, 1965 amendments to the INA, Pub.L. 89–236 § 11(f), 79 Stat. 918). Since *Kovac*, we have found severe economic deprivation to constitute persecution in several instances. *See Baballah*, 335 F.3d at 988–89 (recognizing economic persecution where severe harassment, threats, violence, and discrimination made it virtually impossible for applicant to earn a living); *Gonzalez v. INS*, 82 F.3d 903, 910 (9th Cir.1996) (finding cumulative persecution based, in part, on economic persecution where applicant had both her ration card and her business's ability to buy inventory taken away); *Surita v. INS*, 95 F.3d 814, 819–20 (9th Cir.

1996) (finding economic persecution where applicant suffered multiple robberies and house was looted by soldiers); *Samimi v. INS*, 714 F.2d 992, 995 (9th Cir.1983) (holding that seizure of land and livelihood could contribute to a finding of persecution). Indeed, "[e]conomic persecution has been credited as an important part of asylum claims." *Chand*, 222 F.3d at 1074.

Despite our fundamental acceptance of the principle that the deliberate infliction of substantial economic disadvantage can rise to the level of persecution, there is no easily reducible catalog of facts, the successful proof of which necessarily gives rise to a viable claim of economic persecution. Each petitioner's case must be assessed individually. *Id.* Nonetheless, our precedent does outline the contours of an economic persecution claim. For instance, it is clear that an absolute inability to support oneself or one's family is not required to establish eligibility for asylum. *See Baballah*, 335 F.3d at 989 (citing *Kovac*, 407 F.2d at 107). It is equally well established, however, that mere economic disadvantage alone does not rise to the level of persecution. *See, e.g., Nagoulko v. INS*, 333 F.3d 1012, 1016 (9th Cir.2003) (holding that employment discrimination "is not the type of economic deprivation that rises to the level of persecution"); *Ubau–Marenco v. INS*, 67 F.3d 750, 755 (9th Cir.1995) (noting that confiscation of entire family business without compensation because of family's political beliefs may not be enough, standing alone, to support finding of economic persecution), *overruled on other grounds by Fisher*, 79 F.3d at 963; *Matter of Acosta*, 19 I. & N. Dec. 211, 222, 1985 WL 56042 (BIA 1985) (holding that to rise to the level of persecution, the economic deprivation must be "so severe that [it] constitute[s] a threat to an individual's life or freedom"), *overruled on other grounds by Matter of Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987), *abrogated on other grounds by Pitcherskaia*,

118 F.3d at 647–48. Similarly, "[d]iscrimination on the basis of race or religion, as morally reprehensible as it may be, does not ordinarily amount to 'persecution' within the meaning of the Act," *Ghaly*, 58 F.3d at 1431, even if it generates an adverse economic result. Within the bounds of this spectrum, we have advanced no definitive rule, and none exists, except that the deprivation claimed must be severe enough to constitute persecution. *See id.*

The Gormleys' charge of economic persecution fails because they have not satisfied this baseline requirement; they have presented no evidence that would compel a finding that their experiences rise to the level of persecution. *See id.* Rather, substantial evidence supports the BIA's conclusion that the Gormleys suffered, at most, what may be perceived as reverse discrimination which resulted in some adverse economic consequences.

First, Mr. Gormley's testimony before the IJ undermines the Gormleys' claim of race-based economic persecution. Mr. Gormley stated that "[a] lot of[his white friends in South Africa] ha[d] lost their jobs" as a consequence of the Act, but conceded that not all of them were unable to regain employment. Moreover, Mr. Gormley reported that a number of his black friends had also lost their jobs, though "many are still employed." Rather than demonstrating that, through its implementation of the Act, the South African government has persecuted the "social group" in which the Gormleys wish to be classified, *i.e.*, white, blue-collar, middle-aged South African citizens, Mr. Gormley's statements demonstrate that (1) members of this "social group" are able to find work after being fired, and (2) both blue-collar blacks and blue-collar whites experienced job loss and had difficulty finding replacement employment. Indeed, Mr. Gormley testified that his two (white) sons continue

to be employed. *See Lim v. INS*, 224 F.3d 929, 935 (9th Cir.2000) (noting that the continued presence of family members in the country of origin undercuts an applicant's well-founded fear where there is evidence that the family was similarly situated or subject to similar risk); *Hakeem v. INS*, 273 F.3d 812, 816 (9th Cir.2001) (stating that an "applicant's claim of persecution upon return is weakened, even undercut, when similarly-situated family members continue to live in the country without incident"); *Khourassany v. INS*, 208 F.3d 1096, 1101 (9th Cir.2000) (finding no economic persecution where "some members of [Khourassany's] family continue to live in Israel now and to operate businesses without interference"). Mr. Gormley's account provides substantial evidence that their loss of employment does not rise to the level of economic persecution, as other similarly-situated blue-collar whites were able to maintain and/or regain employment.

Second, the State Department Report upon which the BIA relied made clear that the "[o]wnership of wealth [in South Africa] remains highly skewed along racial lines." *1999 South Africa Country Report* at 1. Notably, the report indicated that "the income distribution gap between white and black" South Africans "is considerable," and "[t]he numerous social and economic problems that developed largely during the apartheid era are expected to persist for many years." *Id.* at 1–2. Though the Gormleys contend that the *1999 South Africa Country Report* is unclear because it does not specify whether the "skew" runs in favor of blacks or whites, we find this position untenable, particularly in light of the fact that petitioner's own affiant, Galea, stated that the Act was designed to rectify the economic disadvantages suffered by the country's black population under apartheid. Viewed as a whole, the administrative record provides substantial evidence that

South Africa's implementation of the Act was intended to ameliorate, not extend, discrimination. *See Elias–Zacarias*, 502 U.S. at 483, 112 S.Ct. 812 (stating that an applicant must "provide *some* evidence of [the alleged persecutor's motive], direct or circumstantial") (emphasis in original).

Third, the South African government provided the Gormleys with not-insubstantial unemployment compensation after they were fired. While in no manner dispositive, this fact militates against a finding that the South African government deliberately imposed the kind of severe economic disadvantage that would constitute persecution. *See Kovac*, 407 F.2d at 107.

Finally, the Gormleys have failed to demonstrate that the South African government's implementation of the Act effectuates purposeful economic persecution. On the contrary, the South African Department of Labour has explained that "[a] good employment equity plan does not trample on the rights of non-designated groups," and, as a consequence, employers "cannot require the dismissal of non-designated groups and their replacement with designated [non-white] employees...." Department of Labour, *Why the Employment Equity Report/Plan*, at http://www.labour.gov.za /docs/legislation/eea/why_the_ee_report.htm. The South African Labour Court recently gave force to this precept in *Coetzer v. Minister of Safety & Sec.*, No. JS222–2002 (Labour Ct. Nov. 29, 2002), *available at* http://www.caselaw.co.za, which rejected as unconstitutional an "Employment Equity Plan" that barred whites from receiving promotions. *See id.* at ¶¶ 32–39 (relying upon § 6(1) of the Employment Equity Act 55 of 1998, which states that "[n]o person may unfairly discriminate, directly or indirectly, against an employee, in any employment policy or practice, on one or

more grounds, including race . . . ethnic or social origin, colour, sexual orientation, age, disability, religion, HIV status, conscience, belief, political opinion, culture, language and birth"). *Coetzer* makes plain that the South African courts are willing and able to censure the sort of discriminatory conduct of which the Gormleys complain. *See id.*

Considered cumulatively, the Gormleys have failed to provide evidence that would compel a reasonable fact-finder to find that they suffered from past economic persecution. *Ghaly*, 58 F.3d at 1429. Accordingly, we cannot conclude that the BIA's decision is "[un]supported by reasonable, substantial, and probative evidence on the record considered as a whole" *Elias–Zacarias*, 502 U.S. at 481, 112 S.Ct. 812, and, therefore, we uphold that decision.

## II.  Well-founded Fear of Persecution

Because the Gormleys failed to establish past persecution, they are not entitled to a presumption of a well-founded fear of future persecution. *See Nagoulko*, 333 F.3d at 1018. We accordingly assess their well-founded fear claim unencumbered.

To establish eligibility on the basis of a well-founded fear of persecution, the Gormleys' fear "must be both subjectively genuine and objectively reasonable." *Ghaly*, 58 F.3d at 1428. "The subjective component may be satisfied by credible testimony that the applicant genuinely fears persecution." *Prasad*, 47 F.3d at 338. The IJ found the Gormleys' factual testimony regarding their fear of persecution to be credible, so they satisfy the subjective element and our inquiry turns solely on the objective prong. *See Fisher*, 79 F.3d at 960–61. The objective component "requires a showing by credible, direct, and specific evidence in the record, of facts supporting a reasonable fear of persecution on the relevant ground." *Id.* at 960.

The Gormleys bear "the burden of making this showing," *id.*, and it is a heavy one; to obtain reversal, they "must demonstrate that any reasonable factfinder 'would have to conclude' that [they] ha[ve] a well-founded fear of persecution." *Ghaly*, 58 F.3d at 1431 (*quoting Prasad*, 47 F.3d at 338).

■ The Gormleys' claim fails because they have presented no "credible, direct, and specific evidence," *Fisher*, 79 F.3d at 960, to support their assertion that they will suffer economic and/or criminal *persecution* if removed to South Africa. The Gormleys have established only that they fear (1) future racial *discrimination* with adverse economic consequences, and (2) potential criminal attacks from random black assailants. These fears, while perhaps well-founded, do not amount to persecution. *See Ghaly*, 58 F.3d at 1431 (admonishing that "persecution is an extreme concept that does not include every sort of treatment our society regards as offensive," and stating that mere "[d]iscrimination on the basis of race or religion, as morally reprehensible as it may be, does not ordinarily amount to 'persecution' within the meaning of the Act"). Because the Gormleys have not provided specific evidence that would compel a reasonable fact-finder "to conclude that the requisite fear of persecution [on account of their race] existed," *id.* at 1429, we decline to review the BIA's determination that they failed to establish eligibility for asylum.

Unable to meet the lesser standard for eligibility for asylum, the Gormleys are necessarily incapable of establishing eligibility for withholding of deportation. *See Fisher*, 79 F.3d at 961.

**PETITION DENIED.**