**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LING ZHOU,

*Petitioner,*

v.

ALBERTO R. GONZALES, Attorney General,

*Respondent.*

No. 03-74712

Agency No.
A79-602-200

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
December 5, 2005—San Francisco, California

Filed February 7, 2006

Before: Betty B. Fletcher, David R. Thompson, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Thompson

## COUNSEL

Drew Sieminski, Oakland, California, for the petitioner.

Joan E. Smiley, Department of Justice, Washington, D.C., for the respondent.

## OPINION

THOMPSON, Senior Circuit Judge:

Ling Zhou, a native and citizen of the People's Republic of China, petitions for review of a decision of the Board of Immigration Appeals ("BIA") affirming an immigration judge's ("IJ") denial of her application for asylum, withholding of removal, and protection under Article 3 of the United Nations Convention Against Torture ("CAT").

Zhou brought newspaper articles pertaining to the Falun Gong[1] into China when she returned from a trip to Singapore. Zhou is not a member of the Falun Gong; she brought the articles to a friend in China who was a Falun Gong member. Shortly thereafter, Zhou came to the United States and, after learning that the police in China had arrested her friend and were looking for her, sought asylum, withholding of removal, and CAT protection. She contends she has a genuine, objective fear that if she is returned to China, she will be persecuted by the government on account of an imputed anti-governmental political opinion involving the Falun Gong.

We have jurisdiction pursuant to 8 U.S.C. § 1252(a), and grant Zhou's petition for review. The record establishes that

---

[1] In *Zhang v. Ashcroft*, 388 F.3d 713 (9th Cir. 2004), we stated that "Falun Gong" is the name attributed to a particular blend of meditation and beliefs, as well as the group that practices it. *See id.* at 715-16. We also described, and the instant record again explains, that the Chinese government perceives the Falun Gong as a political threat and has officially banned the group. In addition, the government has engaged in an ongoing "severe political, propaganda, and police campaign against the Falun Gong." *Id.* at 716.

she is entitled to withholding of removal, and we grant that claim. We also conclude that she is eligible for asylum, and we remand that claim to the BIA for the Attorney General to exercise his discretion as to whether to grant it. We deny Zhou's claim for protection under the CAT.

## I.   Background

Zhou entered the United States on May 30, 2001, as a non-immigrant visitor for business, with authorization to remain until June 29, 2001. Having never left the United States, Zhou applied for asylum, withholding of removal, and CAT protection on September 12, 2001. On January 2, 2002, the INS brought removal proceedings against her.

In her removal hearing before the IJ, Zhou testified that prior to entering the U.S. she held a supervisory position at a private software company in China. This position required her to make repeated trips to Singapore during 2000 and 2001. Shortly after returning from one such trip in May, 2000, Zhou attended a party at which she spoke with an acquaintance, Yung Su, about the Falun Gong.

Zhou and Su had attended the same college from 1991 to 1994, but were not close friends. Su told Zhou that she was an active Falun Gong practitioner and organizer. Knowing that Zhou had recently returned from Singapore, and curious about how the foreign press portrayed the Falun Gong and the Chinese government's actions against it, Su asked Zhou to bring her newspaper articles about the Falun Gong from Singapore.

In May of 2001, Zhou returned to China from a trip to Singapore and brought Su approximately twenty articles from Singapore newspapers which were critical of the Chinese government's treatment of the Falun Gong. Although Zhou knew that bringing articles about the Falun Gong into China was illegal, she did not "give a thought about [the] risk of the

whole situation" because she had never been searched by Chinese authorities while crossing the border. Zhou is not a Falun Gong member. She testified that she brought the articles into China pursuant to the traditional Chinese custom of helping one's friends.

Later that month, Zhou left China for a previously planned trip to the United States. Weeks later, when Zhou was still in the United States, her brother telephoned her from China and explained that the police had searched her residence in Guangzhou in an attempt to locate and arrest her. Zhou then called a friend in China, who told her that Su had been arrested. In mid-August, Zhou's brother telephoned again, telling Zhou that the Chinese police had searched their parents' home in Loyang looking for Zhou. Sometime around January 1, 2002, Zhou's brother was summoned to the local police station in China and questioned about Zhou. In February, 2002, the Chinese police searched Zhou's parents' home a second time. According to Zhou's brother, the police accused Zhou of bringing "counterrevolutionary materials" into China from overseas.

In support of her asylum application, Zhou submitted photocopies, faxed by her brother, of three search warrants and one warrant for her arrest. Rather than indicating why the Chinese government sought to search the listed addresses, or why Zhou was sought for arrest, the faxed documents referenced a general warrant provision. Zhou explained that she did not have the original warrants because she feared for her family's safety if they mailed government documents to her. Jacques de Lisle, a professor of Chinese law at the University of Pennsylvania, testified for Zhou and confirmed that the Chinese government reads the mail of some people it investigates and that mailing the warrants could be considered illegal. Professor de Lisle also testified that he agreed with the State Department's reports that there is a "massive" market for fraudulent documents, including arrest warrants, in China.

The IJ denied Zhou's application for asylum, withholding of removal, and CAT protection. The IJ based the denial of Zhou's application for asylum and withholding of removal on an adverse credibility finding. In the alternative, the IJ determined that even if Zhou were credible, these claims would still fail because she did not establish that the Chinese government would impute a political opinion to her and, because of that opinion, target her for persecution. The IJ also stated that there was no evidence, or allegation, that prosecution in China for violation of the law against the importation of Falun Gong literature is limited to Falun Gong practitioners or supporters (of which Zhou is neither) and that prosecution for violation of a law of general applicability that is not based on a protected ground does not constitute persecution within the meaning of immigration law. The IJ denied Zhou's CAT protection claim on the ground that her punishment for violation of the applicable Chinese importation law would not rise to the level of torture.

The BIA adopted the IJ's reasoning and affirmed. In addition, the BIA stated a third reason for denying Zhou's asylum application. It stated that, even if Zhou had been able to demonstrate that Chinese authorities were pursuing her on account of an imputed political opinion, she had failed to demonstrate that she feared punishment sufficient to rise to the level of persecution. The BIA stated that Zhou had "failed to demonstrate that the criminal penalty for a first offense of smuggling newspaper articles would rise to the level of persecution such that she would be eligible for asylum," and dismissed her appeal. Zhou then petitioned this court for review.

## II.   Discussion

"Where, as here, the BIA adopts the immigration judge's decision and also adds its own reasons, we review both decisions." *Nuru v. Gonzales*, 404 F.3d 1207, 1215 (9th Cir. 2005). Factual findings underlying the determination that Zhou was ineligible for asylum, withholding of removal, and

CAT protection are reviewed under the substantial evidence standard. *See id.* Under this standard, the eligibility determinations must be upheld if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *See Khup v. Ashcroft*, 376 F.3d 898, 902 (9th Cir. 2004) (quoting *Gormley v. Ashcroft*, 364 F.3d 1172, 1176 (9th Cir. 2004)). To reverse, the evidence "must have been such that a reasonable fact-finder would have been compelled to conclude that [the petitioner] was eligible for relief." *See id.* (citing *Gormley*, 364 F.3d at 1176).

## A.   Credibility Determination

**[1]** Adverse credibility findings are reviewed under the substantial evidence standard. *Gui v. INS*, 280 F.3d 1217, 1225 (9th Cir. 2002). "Although [the substantial evidence] standard is deferential, the [IJ] must have a legitimate articulable basis to question the petitioner's credibility, and must offer a specific, cogent reason for any stated disbelief." *Shah v. INS*, 220 F.3d 1062, 1067 (9th Cir. 2000) (internal quotation marks omitted). The reasons given by the IJ must also "be substantial and bear a legitimate nexus to the finding that the petitioner is not credible." *Id.* (quoting *Osario*, 99 F.3d at 931) (internal quotation marks omitted).

### 1.   Plausibility

**[2]** Underpinning the IJ's finding that Zhou was incredible was his opinion that it was "implausible" that Zhou "would risk her privileged position in Chinese society, her excellent job as director of administration, her opportunity to work abroad in Singapore and her freedom, all just to provide a mere acquaintance with the favor of illegal material." This was insufficient for the IJ's incredibility finding.

**[3]** The IJ did not identify any specific, cogent reason to support his incredibility finding. His disbelief of Zhou's testimony was instead based on speculation and conjecture about

Zhou's position in Chinese society and what someone in that position would or would not do. We have repeatedly explained that such an analysis "cannot serve as a reason for an adverse credibility finding." *Shah*, 220 F.3d at 1071; *see also, e.g.*, *Karouni v. Gonzales*, 399 F.3d 1163, 1177 (9th Cir. 2005); *Bandari v. INS*, 227 F.3d 1160, 1167-68 (9th Cir. 2000); *Lopez-Reyes v. INS*, 79 F.3d 908, 912 (9th Cir. 1996).

### 2. Inconsistencies

The IJ also noted discrepancies in the residential addresses listed on Zhou's housing permit, her asylum application, and the Chinese search warrants. When Zhou applied for asylum she listed her rental residential address in Guangzhou, which was inconsistent with the Louyang address listed on her Chinese housing permit. The search warrant for Zhou's home lists the address of her rental unit in Guangzhou. Zhou explained that the Chinese government does not allow people to get a household registration for units that they rent.

Professor de Lisle testified that privately employed individuals may or may not be able to obtain a new household registry when they change addresses, depending on "local circumstances and what the local authorities wish to do, what the housing market is like, [and] the whims of the bureaucrats." The IJ, however, rejected de Lisle's testimony because his explanation purportedly focused on registration difficulties faced by China's migrant laborers, rather than professionals like Zhou. In fact, Professor de Lisle described the likelihood of receiving a new registration as a "spectrum," with "illegal migrant" laborers (who are almost never awarded new registrations) at one end, state employees (who are almost always awarded new registrations) at the other, and private employees "in between."

**[4]** As we have previously stated:

> [W]e will not uphold an adverse credibility finding unless the IJ or BIA specifically explains the signifi-

cance of the discrepancy or points to the petitioner's obvious evasiveness when asked about it. If discrepancies "cannot be viewed as attempts by the applicant to enhance his claims of persecution, [they] have no bearing on credibility."

*Shah*, 220 F.3d at 1068 (quoting *Damaize-Job v. INS*, 787 F.2d 1332, 1337 (9th Cir. 1986)). Nowhere in the record does the IJ explain any significance between the discrepancies in Zhou's addresses and her asserted claims, nor does he identify any "obvious evasiveness." Accordingly, the discrepancies in Zhou's addresses flagged by the IJ may not form the basis for an adverse credibility finding.

### 3.  Corroboration

The IJ gave "diminished weight" to letters, urging Zhou not to return to China, written by a friend of hers and by her father because "none of these individuals were available for cross-examination." The IJ treated this unavailability for cross-examination as a lack of corroboration, which caused him to doubt the credibility of Zhou and of the letters themselves.

**[5]** Regarding Zhou's credibility, "it is inappropriate to base an adverse credibility determination on an applicant's inability to obtain corroborating affidavits from relatives or acquaintances living outside of the United States—such corroboration is almost never easily available." *Sidhu v. INS*, 220 F.3d 1085, 1091-92 (9th Cir. 2000) (citing *Lopez-Reyes*, 79 F.3d at 912. It was even more inappropriate in the present case for the IJ to support his adverse credibility determination with Zhou's inability to obtain live testimony from persons living abroad.

**[6]** As for the reliability of the letters themselves, failing to authenticate them may not serve as a basis for an adverse credibility determination without some evidence of forgery or

other unreliability. *See Shah*, 220 F.3d at 1071 (holding that "[t]he BIA impermissibly grounded its adverse credibility finding on its observation that none of the[ ] letters [the Shahs submitted] ha[d] been authenticated" where there was "no evidence in the record to support the BIA's apparent belief that the letters are unreliable or forged" (third alteration in original)). Here, there was no evidence of forgery or unreliability, and it was inappropriate for the IJ to give the letters "diminished weight."

Nor was it appropriate for the IJ to give "diminished weight" to the faxed warrants; Zhou explained that she feared for her family's safety if they sent the originals, and Professor de Lisle supported that testimony.

**[7]** In sum, we reverse the IJ's adverse credibility findings because they rest on impermissible grounds. We deem Zhou's testimony and her supporting documentary evidence credible. *See id.* at 1072.

### B.   Asylum

**[8]** To be eligible for asylum, Zhou must show that she is unwilling or unable to return to China "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). A political opinion rightly or wrongly imputed to the victim by her persecutors constitutes a "political opinion" for the purposes of asylum. *Sangha v. INS*, 103 F.3d 1482, 1489 (9th Cir. 1997). Zhou conceded during her removal hearing (and the record makes clear) that her asylum claim sounds solely in imputed, rather than actual, political opinion.

We analyze Zhou's asylum claim by considering the following three factors: (1) Does Zhou have a "well-founded fear" of adverse treatment by the Chinese government if she returns to China? (2) If so, does that adverse treatment rise to

the level of "persecution"? (3) If it does, would that persecution be "on account of" a political opinion imputed to Zhou by the Chinese government?

### 1. Well-Founded Fear

[9] Zhou fears that she will be arrested and punished if she returns to China.[2] Zhou must prove that this fear is well-founded. To do so, she "must show that her fear is both subjectively genuine and objectively reasonable." *Abedini v. INS*, 971 F.2d 188, 191 (9th Cir. 1992). Because Zhou credibly testified that she fears arrest and incarceration should she return to China, we conclude that she has established the subjective part of the well-founded fear requirement. We next consider the objective reasonableness of that fear.

[10] The record shows that the Chinese government has arrested Su, the friend to whom Zhou gave the Falun Gong articles, and that the government has targeted Zhou for arrest as well. According to friends and family, the police repeatedly searched residences associated with Zhou in attempts to arrest her. The record also contains copies of the search and arrest warrants. Zhou testified that, according to her brother, the police explained to her family that she had brought "counter-revolutionary materials" into China from overseas. The police also told Zhou's brother that the family should convince Zhou to return to China.

In *Zhang*, which involved a Falun Gong practitioner, we stated:

> The police accused Zhang of participating in illegal activities in the United States, blamed him for dis-

---

[2]The BIA argued that any arrest and punishment of Zhou by the Chinese government for her importation of Falun Gong materials would not be inappropriate treatment but simply arrest and punishment for the violation of a general law of China. We discuss this argument *infra*.

tributing anti-government materials, and warned
Zhang's parents that he must immediately report to
the police upon return to China. This evidence of
government interest in Zhang increases his likeli-
hood of future persecution. *See, e.g.*, *Hoxha v. Ash-
croft*, 319 F.3d 1179, 1184 (9th Cir. 2003) (holding
that police summons demonstrated an individualized
risk of persecution for purposes of asylum eligibil-
ity) . . . .

*Zhang*, 388 F.3d at 718-19. As in *Zhang*, the Chinese govern-
ment has demonstrated an individualized interest in Zhou that
increases the objective reasonableness of her fear of being
arrested and punished.

In addition, Professor de Lisle testified to the treatment
Zhou likely would face upon returning to China given the
government's sustained interest in finding and arresting her
for importing and distributing the Falun Gong articles. In the
least, Zhou can expect a period of detention by a "local public
security authority," which has "a documented and widely-
reported practice of physical mistreatment of people, many
people[,] who are detained for Falun Gong activities." Zhou
would also be subject to formal incarceration, either through
formal criminal proceedings and sentencing, or, more likely,
through the "formal administrative . . . sanction of reeducation
through labor, which can include sentences of one to three
years in prison."

**[11]** We are satisfied that the evidence in this case compels
the conclusion that Zhou's fear of arrest and punishment
should she return to China is subjectively genuine and objec-
tively reasonable.

### 2.   *Rising to the Level of "Persecution"*

Zhou must also establish that the arrest and punishment she
fears rises to the level of "persecution," which is "an extreme

concept, marked by the infliction of suffering or harm . . . in a way regarded as offensive." *Li v. Ashcroft*, 356 F.3d 1153, 1158 (9th Cir. 2004) (en banc) (internal quotation marks and citations omitted). In *Zhang*, we considered the case of a Falun Gong practitioner who faced treatment similar to that which Zhou now faces, including possible detention by local authorities, reeducation through labor, and formal criminal incarceration. *See Zhang*, 388 F.3d at 719. We quoted language from a State Department Country Report on China for 2000 describing "abuse of Falun Gong practitioners by the police and other security personnel, including police involvement in beatings, detention under extremely harsh conditions, and torture." *Id.* We concluded that, "[g]iven the widespread and serious abuses of Falun Gong practitioners, as documented in the Country Report, any reasonable fact finder would be compelled to conclude that Zhang faces . . . persecution upon return to China." *Id.*

The instant record contains similar accounts. For example, an Amnesty International report for 2000 discusses the police detention of tens of thousands of Falun Gong practitioners, "[m]any of [whom] are reported to have been tortured or ill-treated in detention." The State Department Country Report on China for 2001 describes the Chinese government's continued crackdown, and states that "[v]arious sources reported that over 200 Falun Gong practitioners died in detention as a result of torture or mistreatment."

Professor de Lisle testified that, although the "vast majority" of people subjected to "reeducation through labor or the other kinds of harassment we're talking about" are Falun Gong practitioners, it was not the ordinary practice of Falun Gong that attracted such "special" governmental attention. Ordinary practitioners are generally allowed to "repent and mend their ways." By contrast, people who are perceived as "threatening the regime" by, for example, holding a leadership role in the Falun Gong or disseminating foreign informa-

tion about the crackdown, are subjected to "harsher sanctions."

**[12]** By bringing into China foreign news clippings critical of the Chinese government's crackdown on the Falun Gong, and giving those articles to her friend whom she knew to be a Falun Gong practitioner and organizer, Zhou engaged in precisely the type of behavior that engenders the "harsher sanctions" of abusive detention, reeducation through labor, or criminal proceedings. Although there is no indication that the Chinese government believes that Zhou actually practices Falun Gong, there is no reason to believe that this will mitigate the harshness of her sanctions or detention for importing and distributing Falun Gong articles. Consistent with our reasoning in *Zhang*, we conclude that the evidence in the present case compels a finding that the treatment Zhou faces if returned to China rises to the level of "persecution."

### 3.   On Account of Imputed Political Opinion

As the final step in establishing her asylum claim, Zhou must prove that her persecution would be on account of an imputed political opinion. "[O]ur analysis focuses on how the persecutor perceive[s] the applicant's actions and allegiances, and what [will] motivate[ ] their abuse." *Agbuya v. INS*, 241 F.3d 1224, 1229 (9th Cir. 2001).

**[13]** The evidence shows that the Chinese government perceives Zhou's actions as a threat to its political power—a threat that motivates the government to locate and arrest her. We have previously identified the political nature of the Chinese crackdown on the Falun Gong. In *Zhang*, we stated that "the government's crackdown on Falun Gong practitioners is motivated by a perceived anti-government political opinion," explaining in part that "the Chinese President announced that the anti-Falun Gong campaign was a major political struggle." *Zhang*, 338 F.3d at 720. The current record contains similar indications. Amnesty International explains that the official

crackdown on the Falun Gong was precipitated by a 10,000-person, passive protest outside the Communist Party leadership compound in Beijing:

> The demonstrators' purpose was to demand official status for Falun Gong and to request dialogue with the government. The authorities, however, are reported to have been mainly concerned by the capacity of the group to mobilize large numbers of followers, unnoticed, for a public demonstration. Subsequently, after some conflicting signals, they branded the Falun Gong a "threat to social and political stability."

Amnesty International, *People's Republic of China: The Crackdown on Falun Gong and other so-called "heretical organizations"*, March 2000, *available at* <http://web.amnesty.org/library/Index/engASA170112000>. The Chinese military's official publication, *Liberation Army Daily*, ran a front-page essay associating the "political ambitions" of Falun Gong's founder with "Western anti-Chinese forces [who] have spared no effort to engage in ideological infiltration to achieve their goal of overturning our socialist system and subverting our state."

In *Zhang*, we acknowledged that the Chinese government imputes anti-governmental political opinions based on Falun Gong-related activities other than practice itself. In ultimately concluding that the petitioner in *Zhang* faced persecution based partially on an imputed anti-governmental political opinion, we repeatedly highlighted the fact that he mailed Falun Gong materials from the United States to relatives in China. *See, e.g.*, *Zhang*, 388 F.3d at 718 ("The police . . . blamed [Zhang] for distributing anti-government materials . . . ."); *id.* at 719 ("Zhang would be arrested, imprisoned, and abused based on his practice of Falun Gong, *and his distribution of Falun Gong materials to family and friends in China*." (emphasis added)). This is consistent with Professor de

Lisle's expert testimony in the present case that China perceives Falun Gong-related activities, such as leadership or distributing critical information, to constitute a greater political threat than individual practice, and punishes the different behaviors accordingly.

**[14]** Zhou fears arrest and punishment pursuant to prohibitions that exist to punish those affiliated with the Falun Gong, whether through practice, leadership, or distribution of information. She stands accused not of practice, but of an importation and distribution activity the Chinese government views as a greater political threat. Police in China have attempted to locate and arrest Zhou for bringing into China "counterrevolutionary" (i.e., anti-governmental) materials—foreign news articles critical of the Chinese crackdown on the Falun Gong —which she gave to Su, an active Falun Gong practitioner. Consistent with our analysis in *Zhang*, we conclude that the arrest and punishment Zhou fears is on account of an anti-governmental political opinion imputed to her by the Chinese government.

It is useful to contrast this situation with two we faced in prior cases: *Abedini v. INS*, 971 F.2d 188 (9th Cir. 1992), and *Chanco v. INS*, 82 F.3d 298 (9th Cir. 1996). In *Abedini*, we considered the Iranian government's motive for prosecuting the petitioner for having distributed Western films. Although we acknowledged that the ban on propagating Western culture might have political undertones, we concluded that the petitioner failed to show "that the Iranian government's potential act of persecution stemmed from its desire to single him out for unique punishment because of his actually-held or perceived-to-be-held political or religious beliefs." *Abedini*, 971 F.2d at 192 n.1. We also noted: "Nor did [Abedini] testify that his movies were contrary to Islamic principles or even espoused Western beliefs, only that they were made in the West. There is no reason, therefore, for the Iranian government to attribute a special belief or opinion to Abedini." *Id.* at 192.

In the present case, the record shows that the Chinese government will likely arrest and imprison Zhou for importing and distributing material that criticizes the Chinese government and supports a perceived anti-governmental movement. Such activity is illegal in China precisely because the Chinese government views it as a direct political threat. There is ample reason, therefore, for the Chinese government to attribute a specific anti-governmental belief or opinion to Zhou.

In *Chanco*, we analyzed the Filipino government's motive for prosecuting a participant who sought asylum following a failed coup. *See Chanco*, 82 F.3d at 302. We cited *Abedini* for the proposition that "[p]ersons avoiding lawful prosecution for common crimes are not ordinarily deemed refugees." We explained: "Participation in a coup may be distinguished from common crimes, however, in that it is usually a politically motivated act. Consequently, we must look beyond *Abedini* for an appropriate rule." *Id.* at 301. Here, the prohibitions that exist in China for the sole purpose of stamping out the Falun Gong as a specific political opponent are not common crimes, in that their violation is perceived as a politically motivated act. We must again, therefore, look beyond *Abedini* for an appropriate rule.

We ultimately concluded in *Chanco* that, because the Philippines tolerates diverse political views and peaceful protest, it did not aim to punish the petitioner's anti-governmental political opinion, but, rather, the violent manner in which he chose to express that opinion. *See id.* at 302. China, by contrast, is so intolerant of criticism regarding its treatment of the Falun Gong that it has outlawed the importation of foreign news articles on the subject. As we recognized in *Zhang*, such prohibitions are politically motivated.

**[15]** We conclude that the evidence compels a finding that if Zhou returns to China she faces persecution on account of an imputed anti-governmental political opinion. She has,

therefore, produced compelling evidence of the final factor of her claim for asylum.

## C.    Withholding of Removal

"To qualify for withholding of removal, an alien must demonstrate that 'it is more likely than not that [she] would be subject to persecution on one of the specified grounds.' " *Al-Harbi v. INS*, 242 F.3d 882, 888 (9th Cir. 2001) (quoting *INS v. Stevic*, 467 U.S. 407, 429-30 (1984)). "This 'clear probability' standard for withholding of removal is more stringent than the well-founded fear standard governing asylum." *Id.* (internal citations omitted).

**[16]** For the reasons discussed in detail in foregoing parts II(B)(1), (2), and (3), we find compelling evidence that it is more likely than not that the Chinese government will arrest and punish Zhou if she returns to China, that such treatment rises to the level of persecution, and that such persecution is on account of an imputed political opinion. The "clear probability" of these consequences compels the conclusion that Zhou is entitled to withholding of removal.

## D.    Protection under CAT

In order to qualify for CAT protection, Zhou must demonstrate that it is more likely than not that she would be tortured if returned to China. *Zhang*, 388 F.3d at 721 (citing *Khup*, 376 F.3d at 906). Torture is an "extreme form" of cruel and inhuman treatment. *See id.* (quoting *Al-Saher v. INS*, 268 F.3d 1143, 1147 (9th Cir. 2001)).

**[17]** In *Zhang*, we considered the future treatment a Falun Gong practitioner and information disseminator might face, and stated:

    Although the evidence in the record compels a finding that it is more likely than not that Zhang will be

*persecuted* upon return to China, the liklihood of future harm amounting to torture is less pronounced. We cannot say on this record that the evidence compels us to find that Zhang meets the clear probability standard.

*Zhang*, 388 F.3d at 721-22 (emphasis in original). Zhou fears similar treatment for her behavior should she return to China. We reach the parallel conclusion that the record does not compel a finding that Zhou's likely future treatment rises to the level of torture. Substantial evidence therefore supports the IJ and BIA's determination that Zhou is not eligible for CAT protection.

### III. Conclusion

Compelling evidence establishes the following: (1) the IJ erred by making an adverse credibility determination; (2) Zhou has a well-founded fear that, if she returns to China, she will be persecuted by the Chinese government, as, indeed, she more likely than not will be; and (3) the likely persecution Zhou faces is on account of an anti-governmental political opinion imputed to her by the Chinese government due to her Falun Gong-related activities. Substantial evidence supports the finding, however, that the persecution she fears does not rise to the level of torture.

Because the IJ and BIA have already considered all the evidence in this case on the alternative assumption that Zhou was credible, and because we have determined not only that she was indeed credible, but also that the evidence renders her eligible for asylum and entitles her to withholding of removal, we remand this case to the BIA for the Attorney General to exercise his discretion under 8 U.S.C. § 1158(b) as to whether to grant asylum, and we direct the BIA to prepare an appropriate order for withholding of removal. *See Baballah v. Ashcroft*, 367 F.3d 1067, 1079 (9th Cir. 2004). We affirm the BIA's denial of Zhou's application for CAT protection.

**PETITION FOR REVIEW GRANTED; APPLICA-TION FOR WITHHOLDING OF REMOVAL GRANTED; ASYLUM CLAIM REMANDED TO THE BIA FOR THE ATTORNEY GENERAL'S DISCRE-TIONARY DECISION WHETHER TO GRANT ASY-LUM; DENIAL OF CAT PROTECTION CLAIM AFFIRMED.**