**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 23-1236**

───────────────

HANUMANT PRAFULLA JOSHI,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

───────────────

On Petition for Review of an Order of the Board of Immigration Appeals.

───────────────

Argued:  March 19, 2024                    Decided:  August 8, 2024

───────────────

Before WILKINSON, RICHARDSON, and QUATTLEBAUM, Circuit Judges.

───────────────

Denied by published opinion.  Judge Richardson wrote the opinion, in which Judges Wilkinson and Quattlebaum joined.

───────────────

**ARGUED:**  Madeline Nita Taylor Diaz, Katherine Ann Soltis, TAYLOR DIAZ & SOLTIS PLLC, Falls Church, Virginia, for Petitioner.  Bernard Arthur Joseph, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:**  Brian Boynton, Principal Deputy Assistant Attorney General, Jonathan A. Robbins, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

RICHARDSON, Circuit Judge:

This case requires us to decide whether the involuntary hospitalization of, and administration of electroconvulsive therapy to, an alien with a well-documented history of debilitating and dangerous mental illnesses constituted either "persecution" or "torture." Because substantial evidence supports the Board of Immigration Appeals' determination that it did not, we deny this petition for review.

## I.     Background

### A.     Facts

Petitioner Hanumant Joshi is a 31-year-old Indian national who initially entered the United States on a student visa in 2015 to study industrial engineering as a graduate student at Pennsylvania State University. He has been diagnosed with various mental illnesses, including depression, bipolar disorder, antisocial personality disorder, and schizoaffective disorder. His symptoms include paranoia and delusions. Consistent with those symptoms, Joshi once convinced himself that he was living in a movie. Over the years, doctors have prescribed Joshi various mood stabilizers and antipsychotic medications; most recently, he was prescribed monthly antipsychotic injections.

Joshi's long history of mental illness began while living in India in 2011. That history continued when he arrived in the United States. He was first involuntarily institutionalized in Pennsylvania in May 2016 after he slashed his wrists during a manic episode. Following his release, Joshi's only sibling, a paternal half-brother called Sameer, came to the United States and escorted Joshi on a flight back to India, where Joshi lived at his father's home.

While still in India, Joshi was forcibly hospitalized in November 2016. Either Joshi's father or Joshi's treating psychiatrist initiated this institutionalization after Joshi stopped taking his medication. Joshi alleges that several people entered his bedroom, pinned him down, and injected him with a sedative. He awoke in a mental institution where he was required to take unknown medication under threat of solitary confinement. Joshi was released after three or four weeks.

A few months later, in February 2017, Joshi was involuntarily committed again in India. Half a dozen men purporting to be police officers bound his hands and feet and transported him to a facility operated by a traditionalist Hindi sect. There, Joshi was again forced to take unknown medication. He was also required to fast and pray and was not permitted to contact his family. After five or six weeks, Joshi managed "to get the main guy there to call [his] mom," who in turn arranged for Joshi's father to secure his release.

Joshi is unclear about how this second institutionalization in India came about. He claims that either his father, his psychiatrist, "or possibly a [paternal] cousin named Amar who had been visiting" was behind it. J.A. 443. Joshi asserts that Amar and Sameer coveted the property that Joshi's father planned to devise to him and were colluding to get rid of Joshi by committing him so that they could take his share. Joshi testified that his parents and his friends warned him about Amar and Sameer's designs; however, he produced no evidence demonstrating that he was actually entitled to his father's property (for example, the will, a letter from an attorney, or other evidence about any inheritance rights).

3

Joshi returned to Penn State for the 2017–18 school year but was involuntarily hospitalized again in May 2018 after police discovered him trying to leap off a balcony to his death. Following his release, Joshi stayed in Pennsylvania and was forcibly committed again in July before being repatriated to India. Back in India, he first lived with his maternal cousin, Abhishek, but eventually settled at his mother's home.

Joshi was involuntarily institutionalized again in India in February 2019. He was having a cigarette on the street when three or four men arrived in an ambulance, "threw [Joshi in] like a sack of potatoes," and transported him to a mental facility. J.A. 444. Once more, Joshi was coerced to take unknown medication. He was released after about five weeks.

Joshi suspects that Abhishek initiated this institutionalization and also had Joshi's mother hospitalized a week later. Joshi did not clearly ascribe a motive to Abhishek as he did with respect to Amar and Sameer. But Joshi's mother suggested some pecuniary purpose, declaring: "Abhishek Shastri is [a] greedy person and he admitted [Joshi] in [a] private mental hospital . . . and me in [a] local mental hospital . . . in February 2019." J.A. 392.

Following his release, Joshi stayed in India, got a job as a technology consultant, and rented an apartment. But only about a month elapsed before Joshi was involuntarily institutionalized again in April 2019. Joshi says that his landlord was responsible this time. He was again taken from the street by men in an ambulance and conducted to the National Institute of Mental Health and Neurosciences ("NIMHANS").

4

At NIMHANS, Joshi was forced to undergo electroconvulsive therapy ("ECT").[1]

He recounted:

> They gave me anesthesia for it and I just remember waking up, feeling weird and zoned out, and not being able to think properly. They told me they were going to do 18 sessions but they let me go after 6. I was there for 5 weeks and given ECT one session per week.

J.A. 444. Joshi still struggles to remember the details of the electroconvulsive therapy sessions. He was not, however, completely isolated from family. In fact, "[a]t that time, [Joshi's] mother had come to Bangalore and had gotten a hotel, and she came and stayed with [Joshi] at the hospital as an attendant." *Id.*

After his release from NIMHANS, Joshi returned to Penn State and reenrolled in his engineering program. At some point, Joshi left the United States and then returned, as

---

[1] Electroconvulsive therapy (sometimes called electroshock therapy) is "the application of electrical current to the scalp in order to provoke a generalized epileptic seizure, for the purpose of alleviating psychotic and depressive symptoms." J.A. 586; *see* Kari Ann Leiknes, Lindy Jarosh-von Schweder & Bjørg Høie, *Contemporary Use and Practice of Electroconvulsive Therapy Worldwide*, 2 Brain & Behav. 283, 283 (2012). Electroconvulsive therapy under anesthesia, or "modified ECT," is the international standard of care where the treatment is resorted to, including in India. *See* The Mental Healthcare Act, 2017, § 95(1)(a) (India) (providing that "electro-convulsive therapy without the use of muscle relaxants and anesthesia" "shall not be performed on any person with mental illness"). It is estimated that one million people worldwide undergo electroconvulsive therapy annually, and the treatment is widely available in the United States, Europe, and Asia. Indeed, "ECT is administered worldwide under involuntary and guardian consent conditions," ranging from 1–3% of electroconvulsive therapy administrations in the United States and Europe to 20–29% elsewhere. J.A. 599. Yet electroconvulsive therapy "remains controversial and stigma-bound." J.A. 587. This is in part because known side effects include "memory impairment," "and whether ECT induces long-term permanent cognitive impairment remains yet obscure." *Id.* Moreover, the United States and Western European countries administer electroconvulsive therapy mainly to combat treatment-resistant depression and have gradually abandoned its application to treat schizophrenia; other countries are following suit.

his latest entry into the country was from Toronto, Canada, using his F-1 student visa in February 2020. In April 2020, Joshi was involuntarily committed after he suffered another manic episode during which he destroyed everything in his apartment. Upon his release from the hospital, Joshi apparently returned to his apartment, entered his roommate's bedroom, and refused to leave. The police arrested Joshi, and he was charged with burglary, criminal trespass, and criminal mischief (the charges have yet to be adjudicated). While still in Pennsylvania, Joshi was yet again involuntarily institutionalized in June 2020 after showing symptoms of severe psychosis and mania.

Due to his repeated commitments, Joshi did not return to school after April 2020. The Government thus terminated his student visa on October 14, 2020. Joshi knew about this; in fact, his international-student advisor at Penn State cautioned Joshi that he could not remain in the United States longer than six months after the termination without major repercussions. Joshi "was actually planning to go back to India to see [his] father one last time, because his [father's] health was failing"; however, he "was given a stern warning not to come back by [his] mother and [his] friends." J.A. 444–45. So Joshi "tried to leave for Canada because [he] had a visa there, but their border was closed because of COIVD-19." J.A. 445. Thus, Joshi asserts, he "was left with no choice but to stay put in State College." *Id.* Meantime, Joshi's father died in November 2020.

After his father's death, Joshi's criminal behavior became increasingly destructive. Police arrested Joshi in December 2020 for disorderly conduct and tampering with a fire apparatus after he pulled a fire alarm. The next day, Joshi was arrested again for disorderly

6

conduct following an altercation with an employee at a Sheetz gasoline station. Joshi was convicted of the first count of disorderly conduct.

Joshi began living in a homeless shelter in April 2021. In October, he was again charged with disorderly conduct. Police encountered Joshi wandering in the street and committed him to the local Center for Community Resources for temporary confinement and evaluation, where Joshi attempted to kick down the door of the room where he was being held. These charges are pending.

U.S. Immigrations and Customs Enforcement ("ICE") apprehended Joshi in November 2021 and issued a Notice to Appear charging him with removability as an alien who failed to maintain the conditions of the nonimmigrant status under which he was admitted to the country. *See* 8 U.S.C. § 1227(a)(1)(C)(i). Joshi admitted the factual allegations in the Notice and conceded his removability. ICE detained him at Pennsylvania's Moshannon Valley Processing Center, where he remains.

## B.      Procedural History

In March 2022, Joshi filed a Form I-589 with U.S. Citizenship and Immigration Services, seeking three forms of relief from removal: asylum, withholding of removal, and protection under the United Nations Convention Against Torture ("CAT"). Joshi's application explained his fear of harm or mistreatment if returned to India: "If I try to go back to my house my half-brother will call an ambulance and commit me to a hospital and will take over my property." J.A. 717; *see* The Mental Healthcare Act, 2017, §§ 89–90 (India) (providing for the involuntary institutionalization of certain mentally ill persons). Joshi later elaborated:

7

[M]y paternal cousin, Mr. Ama[r] Joshi, . . . is very interested in the property that . . . my father has left me . . . . [M]y fear of going to India is that I'll be institutionalized, my power of attorney will be taken . . . [,] and the rights to my property will be taken over by my cousin through my half-brother. That's my primary fear.

J.A. 219.  Though he sometimes spoke generically of a "cousin" collaborating with his half-brother Sameer, nowhere did Joshi articulate that he fears Abhishek (his maternal cousin) in addition to Amar (his paternal cousin).

Joshi claims that if institutionalized in India, no one will help him get out.  He emphasizes that his father is now deceased and his mother—who was herself forcibly committed and remains at risk of future commitment—has proved unable to deliver Joshi from involuntary institutionalization on her own (indeed, Joshi's mother now lives in a women's shelter).  Joshi also insists that the authorities will not help him.  He says he tried to contact the police and social services while hospitalized in Bengaluru but received no help.  He also says that he contacted his local law-enforcement officials in India, who apprised him that he will probably be institutionalized upon his return and that police cannot help him.

In May 2022, the Immigration Judge ("IJ") issued an oral decision denying Joshi's three claims.  From the start, the IJ determined that Joshi's asylum application was untimely because he had to file it within a year after his visa was revoked in October 2020.  "Nevertheless, for the sake of a thorough decision," the IJ considered the merits of Joshi's claims.  J.A. 96.

The IJ first addressed asylum's persecution element.  He rejected Joshi's argument that involuntary institutionalization by Indian authorities "is inherently persecution,"

8

explaining that it was instead a justifiable response to Joshi's "violent and destructive" outbursts. J.A. 97. The IJ likewise rejected Joshi's argument that his forced electroconvulsive therapy was persecution, noting that it is a widely used treatment and that Joshi's modified electroconvulsive therapy conformed to the standard of care. He therefore found that Joshi did not establish past persecution. And because Joshi fears the same harms will befall him upon his return to India, the IJ held that Joshi did not establish a well-founded fear of future persecution, either.

The IJ next determined that even if Joshi's involuntary institutionalization was persecution, Joshi did not show the proper causal relationship, or "nexus," between that persecution and a protected characteristic. Joshi claimed to belong to the protected social groups of Indian men with severe mental illness, Indian men who require medication to control their behavior, and Indian men with mental illness who experience psychosis and exhibit erratic behavior. The IJ assumed that those groups were cognizable but rejected Joshi's contention that they had any bearing on his alleged persecution. According to the IJ, Joshi "attributed concern for his welfare as the motive for the first two times his family . . . sent him to the hospital" and "did not attribute a motive to the remaining times." J.A. 99. To the extent that Joshi claimed Amar and Sameer were targeting him, the IJ found that "they are purely motivated by greed and a desire for [Joshi]'s property and his assets." J.A. 100. There was no evidence that either Amar or Sameer had ever gone after any other Indian men with mental illness or had any intention to do so. "In short, [Joshi]'s testimony reveal[ed] that his fears that he will be institutionalized are on account of a family dispute over property and money, not on account of his actual mental health disorders." *Id.*

9

Having found three bars to Joshi's asylum claim, the IJ declined to address the Indian government's direct role or alleged acquiescence in Joshi's persecution. The denial of his asylum claim also meant the IJ could summarily reject Joshi's claim for withholding of removal: "Since [Joshi] did not meet his burden of proving he is eligible for asylum, it follow[ed] that he . . . failed to meet his burden of proof for the much higher standard necessary for withholding of removal . . . ." J.A. 102.

Finally, the IJ held that Joshi is ineligible for CAT protection. Joshi did not show past "torture" because "[m]odified ECT was not administered for the purpose of inflicting pain or torture." *Id.* And much like his ruling on persecution, the IJ held that, because Joshi fears suffering the same harm if returned to India, he did not establish the requisite probability of future torture, either.

Joshi timely appealed the IJ's decision to the Board of Immigration Appeals ("BIA"). It dismissed Joshi's appeal in February 2023.[2] It first affirmed the IJ's holding that Joshi did not demonstrate past persecution and, consequently, also lacked a well-founded fear of future persecution under the circumstances.

Then the BIA affirmed the IJ's nexus finding. It determined that the first two hospitalizations in India were motivated "by concern for [Joshi's] welfare rather than . . . a protected ground." J.A. 5. Meanwhile, the third and fourth hospitalizations were motivated not by Joshi's protected characteristics, but "by greed and a desire for [Joshi]'s property and assets." *Id.*

---

[2] The BIA did not address whether Joshi qualified for an exception to the one-year filing deadline.

The BIA next dismissed Joshi's challenge to the IJ's rejection of his withholding claim because Joshi did not even meet the lower standard required to establish persecution. Finally, the BIA affirmed the IJ's denial of CAT protection. It agreed with the IJ that Joshi's "past hospitalizations and ECT administration were accepted medical interventions rather than an intentional infliction of pain," adding that Joshi "ha[d] not established that the mistreatment he fears would constitute torture within the meaning of the regulations implementing the CAT." J.A. 6.

## II.    Discussion

Joshi now petitions this Court for judicial review of the BIA's decision. He asserts that the IJ and the BIA erroneously denied his claims for asylum, withholding of removal, and protection under the CAT. We disagree.

"Because the BIA adopted and supplemented the IJ's decision, we must review both rulings." *Santana v. Garland*, 92 F.4th 491, 496 (4th Cir. 2024). But our review is limited to the grounds upon which the Board relied. *Herrera-Martinez v. Garland*, 22 F.4th 173, 18 (4th Cir. 2022). The Agency's legal conclusions are reviewed *de novo*. And the Agency's factual determinations are reviewed under the highly deferential substantial-evidence standard. *See Garland v. Ming Dai*, 593 U.S. 357, 365–66 (2021). Under that standard, administrative "findings of fact are conclusive unless any reasonable adjudicator

11

would be compelled to conclude to the contrary," and this Court may not reweigh evidence. *Nasrallah v. Barr*, 590 U.S. 573, 583–84 (2020) (quoting 8 U.S.C. § 1252(b)(4)(B)).

## A.      Asylum

Section 1158(b)(1)(A) authorizes the Attorney General to grant asylum to applicants who are "refugees," as defined in § 1101(a)(42)(A).  A petitioner satisfies this burden by showing that (1) he is outside the country of his nationality; (2) he is unable or unwilling to return to that country, or avail himself of its protections, because of persecution or a well-founded fear of future persecution; and (3) a protected characteristic—race, religion, nationality, membership in a particular social group, or political opinion—was or will be at least one central reason for persecuting him.  *See id.* §§ 1101(a)(42)(A), 1158(b)(1)(B)(i).

Joshi's primary argument is that the Agency erred in its analysis of the second requirement by determining that his institutionalization and modified electroconvulsive therapy did not amount to persecution.  Yet nothing in the record shows the Agency was "compelled to conclude" that his treatment "amounted to persecution," *Li v. Gonzales*, 405 F.3d 171, 179 (4th Cir. 2005); so its finding stands.

An alien claiming asylum can satisfy his burden of showing persecution in two ways.  8 C.F.R. § 1208.13(b).  First, he can establish he suffered past persecution in his native country.  § 1208.13(b)(1).  That creates a rebuttable presumption that he has a well-founded fear that he will be persecuted upon returning to the country.  *Id*.  Second, the alien can affirmatively establish a well-founded fear of future persecution.  § 1208.13(b)(2).  This requires making "both a subjective and an objective showing."  *Li*, 405 F.3d at 176.

12

"The subjective component can be met through the presentation of 'candid, credible, and sincere testimony demonstrating a genuine fear of persecution.'" *Id*. (citation omitted). The objective component, in contrast, "requires the asylum petitioner to show, with specific, concrete facts, that a reasonable person in like circumstances would fear persecution." *Id*. (citation omitted).

Thus, no matter which route an alien chooses, he must establish that he either suffered or will suffer persecution. "Although neither the [Immigration and Nationality Act] nor the pertinent regulations define 'persecution,' we have characterized it as involving 'the infliction or threat of death, torture, or injury to one's person or freedom, on account of one of the enumerated grounds in the refugee definition.'" *Abdel-Rahman v. Gonzales*, 493 F.3d 444, 449 n.9 (4th Cir. 2007) (quoting *Li*, 405 F.3d at 177). Armed with this definition alone, one could initially think that any involuntary institutionalization and administration of medication amounts to persecution because it "inflict[s] . . . injury to one's person or freedom." But traditional limitations on the concept of persecution foreclose such a conclusion.

A State's "legitimate exercises of sovereign authority" do not typically constitute persecution, even if its actions restrain liberty or could lead to physical injury. Deborah E. Anker & Jeffrey S. Chase, *Law of Asylum in the United States* § 4:6 (2024). Criminal incarceration and conscription are two good examples.

Start with criminal incarceration. We have long recognized that, although incarceration after conviction is literally an "injury to one's freedom," it does not amount to persecution if the imprisonment is to legitimately punish him for criminal conduct. Put

13

simply, imprisonment for murder is not persecution. *Cf. Menghesha v. Gonzales*, 450 F.3d 142, 147 n.2 (4th Cir. 2006) (noting that prosecution for a criminal violation does not alone constitute persecution). This stems from the respect we owe foreign States who act in the legitimate exercise of their sovereign prerogatives. "Every government has the right to enact, implement and enforce its own legislation, inherent in its sovereignty and in the principle of the reserved domain of domestic jurisdiction." Guy S. Goodwin-Gill & Jane McAdam, *The Refugee in International Law* 133 (3d ed. 2007) (citation omitted); *see also Menghesha*, 450 F.3d at 147 n.2 ("This important principle respects a government's freedom to devise its own laws and penalties for criminal conduct."). So when a State prosecutes—and subsequently convicts, sentences, and incarcerates—someone pursuant to a generally applicable and fairly administered law, that person is not a victim of persecution. *See Chang v. Immigr. & Naturalization Serv.*, 119 F.3d 1055, 1060 (3d Cir. 1997); Anker & Chase, *supra* § 4:6.

Military conscription likewise is not persecution. In many ways, conscription is more drastic than incarceration is. In both, the targeted individuals have seriously diminished freedoms. But conscription applies to a broader group than those who commit crimes and subjects those conscripted to a high risk of death. Still, conscription is not generally considered persecution. That is because "the obligation to perform military service is considered an essential part of the social contract between the state and its people, and action by the sovereign compelling such service is generally viewed as legitimate." Anker & Chase, *supra* §§ 4:26, 5:29. This Court, sitting en banc, has held as much, stating that "a sovereign nation enjoys the right to enforce its laws of conscription[] and that

14

penalties for evasion are not considered persecution." *M.A. v. U.S. Immigr. & Naturalization Serv.*, 899 F.2d 304, 312 (4th Cir. 1990) (en banc); *cf. Selective Draft Law Cases*, 245 U.S. 366, 378 (1918) ("It may not be doubted that the very conception of a just government and its duty to the citizen includes the reciprocal obligation of the citizen to render military service in case of need, and the right to compel it.").

We conclude that, like incarceration and conscription, the Agency was not compelled to conclude that Joshi's involuntary commitment and treatment for his dangerous mental illnesses was persecution. Such treatment is a legitimate exercise of India's sovereign authority.[3] And "the state also has authority under its police power to

---

[3] As the Supreme Court has recognized, civil commitment implicates two important sovereign interests. First, a "state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves." *Addington v. Texas*, 441 U.S. 418, 426 (1979); *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 332 (1993); *United States v. White*, 927 F.3d 257, 264 (4th Cir. 2019); *see also United States v. Charters*, 829 F.2d 479, 498–99 (4th Cir. 1987), *vacated on reh'g on other grounds*, 863 F.2d 302 (4th Cir. 1988) (recognizing a State's *parens patriae* power to involuntarily administer medication for mental illnesses). The traditional concept of *parens patriae*—which is Latin for "parent of the country"—is inextricably tied to fundamental concepts of sovereignty. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600 (1982); *Parens Patriae*, *Black's Law Dictionary* (12th ed. 2024) ("The state regarded as a sovereign"). Seen as part of "the supreme power of *every* State," a State's power to act as *parens patriae* "is a most beneficent function . . . often necessary to be exercised in the interests of humanity, and for the prevention of injury to those who cannot protect themselves." *Alfred L.*, 458 U.S. at 600 (quoting *Mormon Church v. United States*, 136 U.S. 1, 57 (1890)). Indeed, rather than being merely a "right," States have a "responsibility" to act as *parens patriae* to "take care of persons who 'are legally unable, on account of mental incapacity . . . to take proper care of themselves and their property.'" *Id.* (quoting Joseph Chitty, *Prerogatives of the Crown* 155 (1820)).

15

protect the community from the dangerous tendencies of some who are mentally ill."

*Addington*, 441 U.S. at 426.[4]

Thus, the Agency reasonably concluded that Joshi's involuntary commitment and treatment was "obligatory medical care . . . performed by medical professionals" rather than persecution. J.A. 4. As the Agency documented, Joshi has a fraught medical history. Joshi admits that he suffers from a range of mental illnesses that have led to extreme, bizarre, and sometimes dangerous episodes—*e.g.*, he tried to kill himself at least twice and was arrested multiple times for various aggravated, destructive behaviors—and that the institutionalization and therapy he received were treatments for those illnesses. Indeed, Joshi's testimony indicates that his hospitalizations occurred after he had episodes or was off his medications and ended within weeks of complying with treatment. Joshi thus does not, and indeed cannot, claim that he was neither mentally ill nor harmless to himself or others. And the IJ reasonably concluded that Joshi has "long history of noncompliance with his mental health care and prescribed medication in both the United States and in India," often reverting to noncompliance when released. J.A. 39. So Joshi is precisely the type of person that involuntary civil commitment is legitimately targeted to cover. *See* J.A.

---

[4] The police power, or the "general power of governing," *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012), refers to a State's power "to prescribe regulations to promote the health, peace, morals, education, and good order of the people," *Barbier v. Connolly*, 113 U.S. 27, 31 (1884). Protecting the public is a legitimate goal of legislation. As an example, using the police power, States can both proscribe dangerous conduct and then punish offenders through incarceration. *United States v. Morrison*, 529 U.S. 598, 618 (2000). Such action vindicates a State's interest in retribution and deterrence. *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168 (1963) (recognizing "the traditional aims of punishment—retribution and deterrence").

16

223–24 (acknowledging Joshi's previous forced treatment and medical interventions in both the United States and India). The record thus does not compel the conclusion that his commitment and involuntary medication amount to persecution.

Joshi more specifically argues that the administration of modified electroconvulsive therapy amounted to persecution. But, as the IJ found, the treatment is widely considered a legitimate medical procedure. While Joshi disputes this finding, it enjoys substantial support in the record.[5] After all, Joshi's therapy complied with applicable standards of care—*viz.*, it was done under anesthesia—and was administered at one of India's leading medical institutions. *Cf. Angel-Lopez v. U.S. Att'y Gen.*, 853 F. App'x 440, 445 (11th. Cir. 2021) (finding no fear of future persecution when no evidence showed that modified electroshock therapy would be done contrary to accepted medical standards). In short, Joshi's modified electroconvulsive therapy—although involuntary—amounted only to a "medically routine" administration of an accepted treatment for the types of mental illnesses from which he suffers. *See Li*, 405 F.3d at 179.[6]

---

[5] *See* J.A. 829 ("ECT is generally prescribed for severe depression, mania, schizophrenia, and other mental health conditions when other treatment has failed to work or for quicker results."); J.A. 887 ("ECT is used to treat bipolar disorder and severe depression in cases where antidepressant medication, psychotherapy, or both have proven ineffective."); *see also supra* n.1. Though Western medical professionals are gradually eschewing the use of electroconvulsive therapy to treat schizoaffective disorder, it is generally not our place to declare a practice persecutorial simply because it is rare in the United States. *See Williams v. Att'y Gen. of U.S.*, No. 22-2468, 2023 WL 4014467, at *4 (3d Cir. June 15, 2023). Indeed, the main clinical indication for electroconvulsive therapy throughout Asia remains schizophrenia.

[6] The IJ also found that Joshi was "unable" to "consent to . . . a medical course of treatment for his mental health disorders." J.A. 40. Joshi attacks this conclusion, but, (Continued)

Joshi also argues the mere fact of his confinement and treatment amounted to persecution. But again, the Agency was not required to agree. As for his actual commitment, Joshi was involuntarily hospitalized in India four times, with each hospitalization lasting for about four to five weeks. During that time, he was forced to take medications against his will. Given that Joshi was lawfully subjected to nearly the same treatment—involuntary hospitalization and medication—in the United States, we can't say that such treatment amounts to "a barbaric practice unbecoming of a civilized society." *Niang v. Gonzales*, 492 F.3d 505, 510 (4th Cir. 2007); *cf., e.g.*, 18 U.S.C. § 4246(d).[7] Even treatment conditions that are harsher than those prevalent in America do not automatically constitute persecution. *Cf. Williams*, 2023 WL 4014467, at *4 ("Evidence of substandard mental health care, without more, is insufficient to show [persecution.]"). All of this, of course, is not to say that involuntary commitment as mental-health treatment categorically fails to amount to persecution. *See Temu v. Holder*, 740 F.3d 887, 890 (4th Cir. 2014) (assuming without deciding that an alien suffered past persecution when he was

---

based on the nature of his mental illnesses, we cannot conclude that the IJ's finding was clearly erroneous. Though Joshi points out that he was able to consent to treatment while in the United States, that does not unequivocally show that he was similarly lucid while suffering from his episodes of mental illness in India. And a patient's inability (as opposed to refusal) to consent provides the State with its strongest justification for involuntary treatment. *Charters*, 829 F.2d at 498–99.

[7] That conduct is widely accepted in America is good evidence that it's not persecution. But the inverse does not hold. Conduct may still not amount to persecution even when it is generally rejected in America. *Cf. Chen*, 195 F.3d at 204 (monetary penalties for violating one-child policy not persecution); *Li v. Immigr. & Naturalization Serv.*, 92 F.3d 985, 988 (9th Cir. 1996) (imprisonment for illegally departing home country not persecution).

involuntarily institutionalized for mental illness, his "hands and feet [were tied] for five to seven hours a day, four days a week," "he was bound and beaten with leather straps," and "guards beat [him] with a club about his elbows and feet four days per week"). But the methods employed by India here are not so plainly improper that the Agency could only conclude that they amounted to persecution.[8]

In sum, the substantial evidence in the record supports the Agency's determination that Joshi's involuntary institutionalization and modified electroconvulsive therapy were not persecution. And since Joshi's claimed fear of future persecution mirrors his claimed past persecution, so too must the Agency's determination that Joshi failed to establish a well-founded fear of future persecution.

Perhaps recognizing the legitimacy of his medical treatment, Joshi shifts his attention away from those at the mental health institution to three other supposed persecutors: his cousins and half-brother. According to Joshi, one or two of his four institutionalizations were caused by those relatives, not out of concern for his health, but

---

[8] Joshi responds by briefly arguing that the IJ ignored certain evidence in the record, such as the fact that one of the institutions he was committed to imposed limited fasting requirements and that he was allegedly mistreated by other patients. But instead of explicitly arguing that those circumstances prove persecution, Joshi limits his argument to the claim that the IJ erred by not specifically addressing that evidence in its order. So to the extent Joshi could have argued that those factors delegitimized his commitment and treatment, we find that argument forfeited. *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017). As to the claim he did make, we disagree that the IJ abused its discretion by ignoring Joshi's evidence. As he recognizes, the BIA and IJ need not specifically address every piece of evidence as long as the reviewing court can tell that the IJ fully considered the claims. *Ibarra Chevez v. Garland*, 31 F.4th 279, 292 (4th Cir. 2022). Here, we are satisfied that the IJ and BIA did just so and merely concluded that Joshi's treatment was, on the whole, a legitimate exercise of the State's sovereign authority.

rather out of a desire to obtain the property his father supposedly bequeathed him. And Joshi fears they'd institutionalize him again for the same reason were he returned to India. The IJ appeared to accept these contentions, explaining that Joshi's cousins and half-brother "are purely motivated by greed and a desire for [Joshi]'s property and his assets." J.A. 100. So, too, did the BIA. Thus, per Joshi, the persecutors' aim wasn't to treat his mental illnesses and protect him and the public but to get his assets.

This argument runs into several obstacles. For one, it was the State, through its involuntary-commitment laws and mechanisms, that conducted the alleged "persecution" against Joshi. Though his family members might have triggered the process, totally different people and institutions carried out the detention and treatment. Also, nothing in the record suggests that Joshi's relatives could institutionalize him absent Joshi's mental illnesses and symptoms.

But even if Joshi's relatives' actions amounted to persecution, Joshi's argument fails due to another requirement for asylum: "nexus," *i.e.*, that the persecution be "on account of" a protected ground. *See Madrid-Montoya v. Garland*, 52 F.4th 175, 179 (4th Cir. 2022). Remember, Joshi claimed that he is being persecuted because of his membership in three "particular social groups": Indian men with severe mental illness, Indian men who require medication to control their behavior, and Indian men with mental illness who experience psychosis and exhibit erratic behavior. If, as the Agency found, Joshi's relatives were all motivated by a desire to steal his property, then they did not target Joshi "on account of" his mental illness.

20

As Joshi rightly points out, an alien's claimed protected ground need only be one reason motivating the persecution, not the sole reason. *See Cruz v. Sessions*, 853 F.3d 122, 127–28 (4th Cir. 2017). So the financial motive does not necessarily negate the possibility that Joshi's alleged persecutors were also motivated by his status as a person with a mental illness. Still, the protected ground must be a *central* reason for the claimed persecution. *Id.* at 127. Thus Joshi attempts to link his mental illness and familial wealth as motivators for his persecutors: "While [his relatives] were motivated in part by greed and the desire to take over Mr. Joshi's inheritance, the reason they are targeting Mr. Joshi and not some other person is because of his membership in the proposed [particular social groups]." Pet. Br. at 25.

But the record does not compel this conclusion; rather, substantial evidence supports the Agency's contrary one. Joshi testified that his relatives were targeting him, and him alone, because his father devised *him* property. In other words, the record shows that there was no "other person" that the relatives could have targeted to obtain the desired property, and that the relatives were motivated to target Joshi, mental illness or not. Put simply, the record suggests that the only central reason for their alleged persecution was Joshi's inheritance. So the IJ's finding that "[Joshi]'s . . . fears that he will be institutionalized are on account of a family dispute over property and money, not on account of his actual mental health disorders," was far from one that no reasonable adjudicator would have made. *See Lopez-Benitez v. Garland*, 91 F.4th 763, 768 (4th Cir. 2024) ("Factual findings are 'conclusive unless the evidence was such that *any* reasonable adjudicator would have been *compelled* to a contrary view.'" (citation omitted)).

21

In the end, the record shows that the Agency reasonably found that Joshi neither suffered persecution nor has a well-founded fear of future persecution. And even if that weren't so, as to Joshi's relatives, nothing compelled the further finding that said persecution was "on account of" Joshi's membership in a protected group. So the Agency's rejection of Joshi's claim for asylum must stand.

### B.     Withholding of Removal

Both applications for asylum and applications for withholding of removal require a showing of persecution. *See Salgado v. Sessions*, 882 F.3d 451, 456–57 (4th Cir. 2018). In fact, "the standard of proof for withholding of removal is higher, requiring the applicant to establish a 'clear probability' of persecution, rather than the less stringent 'well-founded fear' of persecution that will suffice to make out an asylum claim." *Id.* at 456. Since Joshi has not made out the well-founded fear of persecution necessary to obtain asylum, he necessarily cannot show the clear probability of persecution required to secure withholding of removal. *See, e.g.*, *Ayala-Osegueda v. Garland*, 92 F.4th 220, 227 (4th Cir. 2024).

### C.     Convention Against Torture Protection

Finally, Joshi challenges the determination that he is not entitled to CAT protection from further institutionalization or from electroconvulsive therapy. To receive CAT protection, "an alien must prove, first, that it is more likely than not that he will be tortured if removed to the proposed country of removal and, second, that this torture will occur at the hands of the government of with the consent or acquiescence of the government." *Turkson v. Holder*, 667 F.3d 523, 526 (4th Cir. 2012); *see* 8 C.F.R. § 1208.16(c)(2). The IJ found that Joshi "failed to demonstrate that he will be tortured if removed to India" since

22

"[m]odified [electroconvulsive therapy] was not administered for the purpose of inflicting pain or torture." J.A. 102. The BIA affirmed.

The Agency's regulations define torture as:

> any act by which severe pain and suffering, whether physical or mental, is *intentionally inflicted on a person for such purposes as* obtaining from him . . . or a third person information or a confession, punishing him . . . for an act he . . . or a third person has committed or is suspected of having committed, intimidating or coercing him . . . or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity.

8 C.F.R. § 1208.18(a)(1) (emphasis added); *see also id.* § 1208.18(a)(5) ("In order to constitute torture, an act must be specifically intended to inflict severe physical or mental pain or suffering. An act that results in unanticipated or unintended severity of pain and suffering is not torture."). Whether severe pain and suffering was inflicted for such purposes is a factual question that we review only for substantial evidence. *See Nasrallah*, 590 U.S. at 583–84.

Substantial evidence supports the Agency's finding that Joshi's alleged torturers did not "intentionally inflict[]" his purported pain or suffering for proscribed purposes. *See* J.A. 102 ("Modified [electroconvulsive therapy] was not administered for the purpose of inflicting pain or torture."). To the contrary, the record reasonably suggests that they were accepted medical interventions to *help* Joshi. [*See* J.A. 5–6, 98.] Joshi has offered no evidence that those who hospitalized him or administered the electroconvulsive therapy intended to inflict pain upon him for nefarious purposes. Thus, the IJ and BIA rightly held that Joshi did not establish that his treatment constitutes torture. *See Galan-Najarro v.*

23

*Barr*, 828 F. App'x 480, 481 (9th Cir. 2020) ("[T]he record evidence does not compel the conclusion that Salvadorean government officials at the [National Psychiatric Hospital] have the specific intent to inflict severe harm on patients via the use of [electroconvulsive therapy].").

                        *            *            *

Joshi's mental illnesses are sadly so severe that they sometimes lead to involuntary commitment and treatments. While his treatment in India may, in some ways, differ from his treatment here, the Agency was not compelled to conclude that it amounted to persecution or torture. So Joshi's petition for review must be

*DENIED.*